# HANCOCK *v.* LOUISVILLE & NASHVILLE RAILROAD COMPANY.

# SHELBY RAILROAD COMPANY *v.* LOUISVILLE & NASHVILLE RAILROAD COMPANY.

APPEALS · FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KENTUCKY.

Nos. 325, 326.   Argued April 21, 22, 1892. — Decided May 16, 1892.

The act of the legislature of Kentucky of January 22, 1858, authorizing any railroad company to lease its road to another railroad company, provided its road so leased should be so connected as to form a continuous line, permits the lessee company to take leases of branches by means of which it establishes continuous lines from their several termini to each of its own.

Under the legislation of the State of Kentucky, the right to receive and vote upon the shares of stock in the Shelby Railroad Company which were issued upon the subscription of a part of Shelby County became vested in the Shelby Railroad District of Shelby County as a corporation *quoad hoc.*

THE case is stated in the opinion.

*Mr. B. F. Buckner* for appellant. *Mr. T. L. Burnett* and *Mr. John L. Dodd* were with him on the brief.

*Mr. J. C. Beckham* for appellees.

MR. JUSTICE BREWER delivered the opinion of the court.

These two cases were argued together, the object of attack in each being the same, to wit, a lease made by the Shelby Railroad Company, on July 16, 1879, to the Louisville, Cincinnati and Lexington Railway Company, and subsequently transferred by the latter to the Louisville and Nashville Railroad Company. Each seeks the same relief, the cancellation of that lease. Hancock, the appellant in one case, was a stockholder in the Shelby Railroad Company, the appellant in the other, and sues for the benefit of that company, the allegations of his bill being intended to bring the case within the requirements of equity rule number 94. His bill was filed on the 3d day of December, 1886, and in it he alleges in substance that he notified and requested the Shelby Railroad Company to institute an action for the cancellation of said lease, but that the directors of said company at a meeting held to consider the matter resolved not to institute such action. He charges that the lease was made without legislative authority, and was therefore *ultra vires* and void; and also that it was not ratified by a majority of the stockholders of the Shelby Railroad Company. The Shelby Railroad Company filed its bill on the 4th day of August, 1888, but rested its attack on the validity of the lease on the ground that it had not been ratified by a majority of its stockholders. In disposing of these cases, therefore, two questions must be considered. First, was there legislative sanction for such a lease; and second, if so, was it ratified by a majority of the stockholders of the Shelby Railroad Company. With reference to the first: On January 22, 1858, the legislature of Kentucky passed a general statute which in terms gave to all

railroad companies in the Commonwealth "power and authority to make, with each other, contracts of the following character: . . . 2d, for the leasing of one company to another, provided the road so leased shall be so connected as to form a continuous line; . . . *provided, however*, that all such contracts shall be approved by a majority in interest of all the stockholders of each of the contracting companies, at some stated or called meeting of the same." 1 Sess. Laws, 1857–58, 10.

It is claimed that the lessor's and lessee's roads do not form a continuous line, within the meaning of this statute, and that, therefore, the condition upon which a valid lease could be made was wanting. The main line of the lessee's road extends in a northeasterly direction from Louisville to Cincinnati. At Anchorage, about twelve miles east of Louisville, the Shelbyville road touches it. At the time of the lease the latter road was completed from the place of junction to Shelbyville, a distance of about eighteen miles, the general course being a trifle south of east. There was a physical connection between the two roads at Anchorage, the latter being the western terminus of the Shelbyville road. From this place the main line of the lessee road extends northeasterly, and the Shelbyville road southeasterly, making two forks of the letter "V." Shelbyville is nearly due east from Louisville, and the Shelbyville road, together with the twelve miles of the lessee's road, make a continuous line between Shelbyville and Louisville, in a route about as straight as the average railroad. But Anchorage is not a terminus of the lessee road, and the contention is, that under the statute the leased line must touch one of the termini of the lessee's road, so as to make an extension of it. As counsel expresses it: " Where two roads are in such connection or juxtaposition with each other as that the leasing of one by the other will extend or lengthen the line and create a new terminus, the act applies, and it applies only in such a case." In reference to this contention, the learned judge of the Circuit Court observed: "This construction would authorize the Shelby Railroad Company to lease the L. C. & L. railroad from its junction near Anchorage to Louisville, but not the L. C. & L. R. R. Com-

pany to lease the Shelby railroad from the junction to Shelbyville."

We think this suggestion pertinent, and that the contention of appellant, Hancock, cannot be sustained. It is enough that by the lease the connected roads form a continuous line, and it is not essential that the leased line be an extension from either terminus of the lessee's road. The evil which was intended to be guarded against by this limitation was the placing of parallel and competing roads under one management, and the control by one company of the general railroad affairs of the State through the leasing of roads remote from its own, and with which it has no physical or direct business connection. It was not intended to prevent a company with a long road, like the lessee company, from leasing branches by means of which it establishes continuous lines from their several termini to each of its own. By this lease a direct and continuous line from Louisville to Shelbyville was created, and neither the letter nor the spirit of the statute was thwarted.

But the chief reliance of counsel is on the other question. The Shelby Railroad Company is a corporation created by an act of the general assembly of Kentucky, of date March 15, 1851. 2 Sess. Laws 1850–51, 364, c. 431. That act was amended March 10, 1854, 2 Sess. Laws 1853–54, 453, c. 913; February 15, 1858, 2 Sess. Laws 1857–58, 158, c. 554; and February 3, 1869, 1 Sess. Laws 1869, 260, c. 1393. By the last amendment a part of Shelby County, the boundaries being specifically prescribed in the act, was authorized to subscribe $300,000 to the stock of the company, if a majority of the votes cast at an election should favor such subscription. The result of the election was to be entered on the records of the county court, and if favorable the county judge was to cause the subscription to be made in the name of said portion of Shelby County, and to issue bonds in its name in payment thereof. In pursuance of this act an election was had, and, being in favor of the subscription, it was made, and bonds to the amount of $300,000 were executed and delivered to the railroad company on June 1, 1869. The original charter

authorized the county of Shelby to subscribe for stock, the subscription to be made payable at such times and upon such terms as should be agreed upon, with no provision for the issue of the bonds, but with authority to levy and collect taxes for the purpose of paying such subscription. Section 26 of the act reads:

"That each and every person who pays any part of said tax shall be entitled to his *pro rata* share of said stock in the respective companies authorized and contemplated in this act, and into the treasury of which said tax is paid, and shall be. entitled to demand and receive a certificate so soon as he shall have paid for a full, half or quarter share, or shall produce transfers from those who have paid portions, so as to entitle him to a full, half or quarter share."

The amendment of 1869, which authorized the issue of bonds, also directed a tax to pay the interest and principal of such bonds; and in section 9, provided:

"The several counties and portions of counties shall not vote the stock for which certificates may be issued to the taxpayers, but the same shall be voted by the individual stockholders."

After the issue of these bonds, and on March 11, 1870, an act amending the charter was passed, 2 Sess. Laws 1869–70, 248, c. 626, section 3 of which is as follows:

"That when any county or part of a county, city, town, or precinct, shall have delivered its bonds in payment for stock subscribed, it shall be entitled to representation and to vote the amount of such stock in any meeting of the stockholders of said company. The stock owned by a county shall be represented by the county judge and all of the justices of the peace of the county; stock owned by a part of a county or a precinct, by the county judge and by the justices of the peace residing in the district or precinct taxed."

And on February 26, 1873, a further amendment provided that the part of Shelby County which subscribed stock and issued bonds should have "the corporate name of 'The Shelby Railroad District of Shelby County,' and by that name may sue and be sued."

Now the bills allege that $267,775 of stock was voted at the meeting authorizing the lease, by the representatives of the "Shelby Railroad District of Shelby County," under the authority of the last two acts of the general assembly, and that without such vote the majority of the stockholders did not approve the lease. At that time this amount of the bonds, issued in payment of the subscription, was outstanding. It is true there had been an exchange of the old for new bonds at a lower rate of interest, but the principal of the indebtedness to that amount still remained. The question, therefore, is whether this stock was properly voted by the representatives of the "Shelby Railroad District of Shelby County."

This precise question was presented to the Court of Appeals of Kentucky, in a consolidated action to which certain taxpayers, the Shelby Railroad Company, and the "Shelby Railroad District of Shelby County" were parties, *Kreiger* v. *Shelby Railroad Co.*, 84 Kentucky, 66, and by that court decided in favor of the right of the district to vote the stock. An attempt was made to have the judgment of that court reviewed by this, but the case was dismissed for want of jurisdiction, on the ground that no Federal question was involved. *Kreiger* v. *Shelby Railroad Co.*, 125 U. S. 39. While that case may not work an estoppel by judgment, by reason of a difference of parties, it is an authority to be respected, if not followed.

But, passing that matter, what are the merits of these cases? The contention is, that, by the acts of 1851 and 1869, rights in the stock were vested in the taxpayer, which could not be divested after the issue of the bonds, though attempted to be, by the legislature, in the acts of 1870 and 1873, or as more fully expressed in the brief:

"The acts of 1851 and 1869 confer on the individual stockholders rights which are impaired by the acts of 1870 and 1873; that is, that the exclusive right to vote at stockholders' meetings, and the sole right to receive dividends given by the acts of 1851 and 1869, to the individual stockholders and those who should become so by the payment of taxes, is im-

paired by the acts of 1870 and 1873, which grant the right to the Shelby Railroad District of Shelby County to vote at stockholders' meetings."

With respect to the matter of dividends, we have, in this case, no need of inquiry. The single question is, as to the right to vote this stock. The Court of Appeals held that a corporation was in fact created by the act of 1869, granting authority to a defined portion of Shelby County to subscribe stock and vote bonds; that that corporation, by virtue of the subscription and issue of the bonds, became the owner of the stock; and that the acts of 1870 and 1873 simply prescribed who should represent the corporation, and by what name it should be known. Counsel criticise this ruling severely, asserting that corporations are never created by implication, and that there is in the act of 1869, in terms, no attempt to create one. But this is a matter of a purely local nature. A corporation may be formed in any manner that a State sees fit to adopt; and when the highest court of a State decides that, by certain legislation, a corporation has been created, such decision concludes not only the courts of the State, but also those of the United States. It is a matter over which we have no review, and in respect to which the decision of the state court is final. If it were an open question, it would be difficult to avoid reaching the same conclusion. By the act of 1869, this prescribed portion of Shelby County was authorized to issue bonds and subscribe stock. The bonds when issued were not the obligations of Shelby County, nor of the individual taxpayers; and still there must be some debtor. That debtor was this portion of Shelby County. Giving to it power to issue bonds and create indebtedness, is the creation of an entity with power to act, and if this entity has power to create a debt, it becomes subject to suit. That this entity was not, in terms, named a corporation is not decisive. It is enough that an artificial entity was created, with power to exercise the functions of a corporation. It was, though not named, a corporate entity, and the acts of 1870 and 1873, as well said by the Court of Appeals, simply designate who should act for this corporate entity and give it a name. As a corporate en-

tity, it issued bonds and subscribed for the stock. It became thereby the owner of the stock, and, as owner, it was entitled to exercise all the rights and privileges of ownership, includ ing the right to vote the stock, unless the legislature creating it and prescribing its powers had, in terms, vested such con- trol of the stock in other hands.

But it is said that the acts of 1851 and 1869, in substance, gave to each taxpayer at the time of paying his tax an equal amount of the stock; that an amount of taxes had been paid prior to this lease nearly equal to the entire issue of the bonds; and that, therefore, there was substantially no stock left in the district which it had a right to vote. But the original act authorized no bonds; and did not provide for the payment of the subscription by the issue of bonds, but by taxes levied in amount and at times necessary to pay it according to its terms. When the taxpayer paid his taxes he, in effect, paid to the railroad company a proportionate amount of the subscrip- tion; and the provision was in substance that he should take the stock which he had then paid for. There was, therefore, an equality between the stock and the taxes, and the county was simply an agent to collect the taxes and pay them over to the company, and receive the stock and transfer it to the taxpayer. But the act of 1869 authorized a radical change; and this newly created corporation was not merely the conduit through which money passed from the taxpayer to the com- pany, but it became an independent subscriber, making its own subscription and issuing its own bonds in payment there- for. Those bonds represent and are the equivalent of the stock, and until the taxpayer pays those bonds he has equita- bly no right to the stock. It is true the terms of the original charter were not changed by the amendment of 1869; but to hold that the parties thus far paying taxes — taxes which mainly have gone to the payment of the interest on the bonds — are entitled to the stock works this unreasonable result: Though $300,000 and over of interest has now been paid, the bulk of the bonds remain outstanding, and are yet to be paid, as well as several hundred thousand dollars of interest. Shall the whole issue of stock be absorbed by those who pay the

first interest on the bonds, leaving to those who thereafter pay taxes for account of future interest and to discharge the principal, no right to any stock; or shall the railroad company be compelled to issue stock in excess of the $300,000? Nothing of the latter kind is provided for; nothing to indicate that the district can, by extending the bonds and paying interest, compel an additional issue of stock. All the stock that the railroad company was called upon to issue by the terms of its contract was the $300,000, and that was paid for by the bonds; and the taxpayer's equity in the stock only arises as he pays the bonds, and not as he simply pays interest on them.

The character of the transaction contemplated by the act of 1851 and the difference created by the amendment of 1869, as above indicated, is made clearer by section 20 of the former act, providing " that said company shall not issue certificates of stock until the same shall be paid for." In other words, payment of taxes paid the subscription, and of course worked a right to the stock then paid for. This provision was not changed by the amendment of 1869, but the subscription made by the district was paid for at the time by the issue of its bonds; and having been paid for, it was the duty of the company to issue its stock; and to whom should it be issued but to the party who had made the payment, to wit, the district? Having paid for and owning and possessing the stock, who should vote it? Obviously the owner; and its right to vote should not be diminished until and except when the amount which it has paid for the stock in bonds is made good to it by the taxpayers. Such was the construction placed upon this matter by the Court of Appeals; and we think that construction, notwithstanding some little obscurity in the language of the various statutes, is correct.

With reference to the suggestion made by the counsel for the appellees, that the delay in bringing these suits is such laches as defeats any rights which existed in the first instance, we refer to the case of *The St. Louis, Vandalia & Terre Haute Railroad Company* v. *The Terre Haute and Indianapolis Railroad Company, ante,* 393.

The decrees are                                          *Affirmed.*