UTAH STATE BUILDING COMMISSION, for Use and Benefit of MOUNTAIN STATES SUPPLY CO. v. GREAT AMERICAN INDEMNITY CO. et al.

No. 6591.   Decided August 18, 1943.   (140 P. 2d 763.)

*Thatcher & Young, George H. Lowe,* and *J. Quill Nebeker,* all of Ogden, for appellants.

*Elias Hansen,* of Salt Lake City, for respondent.

CROCKET, District Judge.

This is an action by the Utah State Building Commission for the benefit of the Mountain States Supply Company against Frank Compion, general contractor, and his subcontractor, G. W. Sargent, and Campion's surety, the Great American Indemnity Company. Campion was the general contractor on the Utah State Tuberculosis Sanatorium at Ogden. In connection with this contract, he furnished a bond issued by the Great American Indemnity Company, herein referred to as "the surety," which bond was conditioned to pay for all materials going into the building. The defendant, G. W. Sargent, was a subcontractor to whom the plumbing work on said building was let by Campion. Sargent used certain materials in said building which were purchased from the Mountain States Supply Company,

for which the latter company has not been paid, and it is for such payment that this suit is brought on behalf of the Supply Company. From a judgment for the plaintiffs, all of the defendants appeal.

The first matter to be disposed of in this case is the motion of the respondents to strike the bill of exceptions. It is conceded that the Bill was not settled nor filed within the time allowed by law; the appellants made no showing as to any justification or excuse for not filing it in time, and no order was made extending the time. It is only properly before this court if upon stipulation; the stipulation on file makes the usual recitals concerning the bill being a full, true, and correct record of the proceedings, and contains the following proviso:

"Provided, however, that the plaintiff reserves and does not waive any right it may have to move to strike the Bill of Exceptions or to take such other steps as may be deemed proper if the time for settling said Bill of Exceptions has not been kept alive or is not timely applied for."

It is stated in the brief of the appellant Sargent that appellants believe that the respondents waived the question of the time of settling the bill by signing that stipulation. Are we to understand that this stipulation was binding on the respondents and not on the appellants, or that the appellants take the benefit of the favorable portions of the stipulation and ignore the unfavorable ones?

It plainly and unequivocally appears, and both parties agreed that the respondents did not waive any rights with respect to striking the bill by the stipulation. All that can be said for the stipulation is that apparently the plaintiff was willing to stipulate that the Bill as presented was full, true, and correct, in order to avoid any controversy as to what it should contain, but it certainly was made clear that the plaintiff reserved its rights to have it stricken because of it being presented too late. For the appellants to request this court to go so far as to suppose that there was some legitimate reason for

not having the bill settled nor filed in time and on that basis to deny the motion to strike is asking the court to indulge in a great deal of conjecture for the beneift of the appellants. The bill accordingly is stricken.

The review is limited to the judgment roll, which contains comprehensive findings of fact covering all matters discussed herein.

The surety company claims that the bond it executed is void and unenforceable because of its failure to name the State of Utah as the obligee. The statute requiring such bond, 17-1-1, Revised Statutes of Utah 1933 (now known as the same Section, U. C. A. 1943), provides:

"When such contract is made with the state, or with a state institution, board or commisison which is not a body politic or corporate, the state shall be named as the obligee in such bond."

This statute was no doubt intended to provide a means for any such institution to receive the benefit of such a bond when it had not the legal capacity to do so on its own behalf. But the defendants assert that the Utah State Building Commission is not a "body politic or corporate" and that therefore the bond should have run to the State of Utah, and this suit should have been brought in its name.

This contention leads us first to inquire as to what is a "body politic or corporate." Reference to 5 Words and Phrases, Perm. Ed., p. 602, reveals that the term "body politic" is an old term for a corporation or an association of individuals, and usually applied to the state or other public associations. For one having a further interest in the term, that work traces it back to the institutions of the Romans and Greeks.

The term "body corporate" is a term of more common usage. 1 Bouv. Law Dict., Rawles Third Revision, p. 374, says:

"Body corporate: An early and undoubtedly correct term to apply to a corporation."

At 8 Corpus Juris, p. 1136, the term "body corporate" is defined as a corporation; 11 C. J. S., Body, p. 379 states:

"Body corporate is a term applied to corporations, public and private."

Black, Law Dictionary, gives a similar definition and adds:

"Body corporate and politic: A term particularly applied to a public corporation having powers and duties of government."

Neither the name an entity is given, nor the failure to properly characterize it by name, determines its status in the law. We must look to the nature of the entity, its powers and duties, to determine whether or not it is a corporation. *Rees* v. *Olmsted*, 6 Cir., 135 F. 296, 297, 68 Corpus Juris 67. In Volume 1, Fletcher Cyc. of Corporations, Perm. Ed., 210, it is stated:

"A board or commission serving the whole state, in control of such matters as highways may be a public corporation, although it is not so called by the legislature; and if it has the attributes of a corporation, it will be so regarded," citing the case of *State Highway Commission of Missouri* v. *Bates*, 317 Mo. 696, 296 S. W. 418."

In that case the question was presented as to whether or not the Missouri Highway Commission was a corporate entity separate from the sovereign. The court refers to various authorities touching on this problem, and basing its decision on the fact that the statute permits the commission to contract, to sue and be sued, held that it was a corporate entity.

A leading case cited by most later ones discussing this subject is that of *Gross* v. *Kentucky Board of Managers of World's Columbian Exposition*, 105 Ky. 840, 49 S. W. 458, 43 L. R. A. 703. The court held that the said Board of Managers, appointed by the Governor as an agency of

the State, although not expressly called such, was a corporate entity which could be sued for breach of contract because it had the power to contract.

A case closely resembling the instant one is that of *Whipple* v. *Tuxworth*, 81 Ark. 391, 99 S. W. 86; in that case, the question was whether or not improvement districts created by statute were corporations. The court stated at page 90 of 99 S. W.:

"Improvement districts in this state are organized by the city councils of cities and towns under a valid law. They are given a particular name, and endowed with perpetual succession until their object is accomplished, with power to make contracts, incur debts, issue bonds, collect assessments, to sue, and to compel the city council by mandamus to make assessments. * * * The effect of the statute is to make them corporations, though they are not denominated as such." Citing other case.

In the case of *Hancock* v. *Louisville & Nashville Railroad*, 145 U. S. 409, 415, 12 S. Ct. 969, 36 L. Ed. 755, the Supreme Court of the United States also referred to this problem and stated at page 416 of 145 U. S., at page 971 of 12 S. Ct.:

"This prescribed portion of Shelby county was authorized to issue bonds and subscribe stock * * * if this entity has power to create a debt, it becomes subject to suit * * * it was, though not named, a corporate entity."

This was so, even though no express power to sue or be sued was given to it by statute.

Is the Utah State Building Commission then a corporation? Reference to Volume IX, Words and Phrases, Perm. Ed., page 685, indicates that the distinguishing characteristics of a corporation are that it is an artificial person, a legal entity, capable of acting through its corporate officers and agents, of suing, being sued, of taking and holding property, and of contracting in its own name, and of continuing to exist independent of the individuals who compose it.

The Utah State Building Commission possesses all of these attributes. Title 10, Revised Statutes of Utah, 1933, creates the Utah State Building Commission, whose members are to be appointed by the Governor, provides for their terms of office and succession.

Section 10-0-7 of said title sets out its powers and duties, among which are the following:

"* * * shall carry out the building and expansion program of the state provided by law. * * *

"(3) To make contracts. * * *

"(8) To sue in the name of the Utah state building commission.

"(9) To be sued in the name of the Utah state building commission * * *.

"(10) To buy, lease and acquire * * * whatever property of any kind, real or personal * * *.

"(11) To sell, exchange or lease * * * any and all property * * *."

The section further provides that:

"The foregoing particular enumeration of powers * * * shall not be construed as limiting the powers and authority hereby granted to the commission to those powers particularly enumerated, nor even to the general classes thereof; but it is expressly declared that the Utah state building commission is vested with full power and authority to do any and all things which in its judgment may be necessary or proper for carrying out any of the purposes of this title."

From the foregoing enumeration of powers, it is obvious that the Utah State Building Commission is a body ■ corporate in contemplation of law.

It is interesting to find that the converse of our problems was presented to the Supreme Court of Arkansas in the case of *State* v. *Southwestern Land & Timber Company*, 93 Ark. 621, 126 S. W. 73. There a suit was brought by the state for the benefit of the Board of Directors of the St. Francis Levee District. The defense contended that the Levee District was, even though not called a corporation, a corporate entity, and should have brought the suit. The court said at page 75 of 126 S. W.:

"If the lands belonged to such board, it had the right to [bring] suit to recover them in its own name, as it is a body politic and corporate with power to sue."

It was held that the suit was improperly brought in the name of the state, and no recovery could be had.

This is the exact situation the respondents would have been in if the State of Utah had been the obligee on the bond and the plaintiff in the instant case. The Utah State Building Commission was the only proper obligee on the bond, and the only entity that could have properly brought this action.

Even if the Building Commission had not been a body corporate, there is no doubt that the bonding company, by dealing with it as a legal entity and issuing a bond to it, would have been estopped to deny liability on the bond. The bond expressly provides that the surety waives any defense it may have by reason of any provision therein being in exces of the laws of this state. It is a rule of general application that a bondmaker is estopped to deny liability on the ground that the obligee was without corporate capacity. See 21 Corpus Juris, page 1211; 31 C. J. S., Estoppel, § 110, and *Ingle System Co.* v. *Norris*, 132 Tenn. 472, 178 S. W. 1113, 5 A. L. R. 1580, for this rule and numerous cases supporting it. In the case of *Board of Commissioners* v. *John Shields et al.*, 62 Mo. 247, a board had been established for the purpose of filling up certain sloughs and making public improvements. In a suit upon a bond naming the board as obligee, the defense was interposed that the board was not a corporation. The court said that by making and signing the bond, the company had admitted and could not deny the corporate capacity of the obligee and that this was so even if the formation of the commission was unconstitutional; citing cases, and Cooley's Const. Lim. 254. In another Missouri case, that of *Father Mathews' Young Men's Total Abstinence & Benevolent Society* v. *Fitzwilliam et al.*, 12 Mo. App. 445, affirmed by the Missouri Supreme Court in 84 Mo. 406, a

similar defense was asserted. The court stated that the obligors on the bond of the treasurer who had absconded were estopped to deny the corporate existence of the body to whom the bond was given. See also 31 C. J. S., Estoppel, § 110, p. 353, and American Digest System, Estoppel, 22 (3), for similar cases.

It is conceded that Campion has paid his subcontractor, Sargent, in full on his contract. Campion and his surety take the position that certain money paid by Sargent to the Supply Company was applicable to pay the account for materials which went into the sanatorium. The following facts, as found by the court, are pertinent to this contention: At the time the materials were sold, Sargent had a general account with the Supply Company, and purchased materials for other jobs on said account. The trial court stated in its Finding No. 12:

"That as payments were made by Sargent to this particular job (sanatorium), he directed the same to be so applied, and the plaintiff Mountain States Supply Company, did so apply the same."

And also stated in its Finding No. 15:

"That all of the items which the plaintiff Supply Company sold to the defendant Sargent were carried in one general account, and there was no segregation of the items which were supplied by the plaintiff for use in the construction of the sanatorium building from other items which the plaintiff Supply Company furnished to the defendant, and there was no segregation of the payment made by the defendant Sargent in his account, but such payments were credited generally to the defendant Sargent's account."

Thus it appears that wherever Sargent did designate his payment to be applied to the sanatorium account, it was so applied, but that if no designation was made, it was credited to his general account. The trial court also found that shortly before the commencement of this action, the Supply Company segregated from its general account with Sargent, the materials furnished for the Sanatorium, and the money paid for said materials by making notations on such account. In making this segregation, two payments,

one of $500 made by Sargent to the Supply Company on November 17, 1938, and one of $455.71 paid by Sargent to the Supply Company February 15, 1939, which had been credited to the general account, were segregated from, and not applied to the sanatorium account.

First to consider the $500 payment above referred to: By reference to the payment by Campion to Sargent, and the credits and debits to Sargent's bank account, the court found that $396.60 of said $500 came from moneys paid by Campion to Sargent, who, in turn, paid it to the Supply Company, so the latter company actually received that amount of money which came from Campion. This item of $396.60 is the only amount of money which the court found came from Campion or the sanatorium contract through Sargent to the Supply Company. As to the remaining $103.40 of the $500 item, and as to the $455.71 above referred to, the court found that there was no evidence as to its source; the court also found that with respect to both payments, there was no evidence that Sargent or anyone else directed that that be applied on the sanatorium account; and as to both of said payments that if they had been applied to the Sanatorium account, in each instance, it would have amounted to an overpayment of the amount due, making allowance for the fact that payments for materials delivered was not due until thirty days after delivery. The court made numerous other findings of fact with respect to moneys received and paid by Sargent which amount to mere inferences that some of Campion's money may have reached the Supply Company, but due to the fact that Sargent had other jobs, there is an equal inference that proceeds of some other jobs paid for some of the sanatorium materials.

It is the position of the appellants, Campion and his surety, that both of the above referred to payments, $500 and $455.71, and especially the $396.60, which was shown to have come directly from Campion, should have been applied against the sanatorium account.

As to this latter amount, the question is placed thus: Can the surety or Campion, the general contractor, require that the money which he paid to his subcontractor and which was in turn paid to the materialman, insist that the materialman apply it to pay for the materials used on Campion's job when there was no direction as to how the money should be applied, and when the materialman did not know the source of the money?

This question is dealt with in the case of *Salt Lake City* v. *O'Connor et al.*, 68 Utah 233, 249 P. 810. We are aware of the several distinctions of fact between the O'Connor case and the instant one as pointed out in appellant's brief, but the underlying principles of law are the ■ same. The O'Connor case is also reported at 49 A. L. R. 941, and the syllabus of the case is correctly stated as follows:

"The surety on the bond of a contractor for public work is not entitled to credit, as against persons furnishing material for the work, for payments made to them out of the contract price by the contractor upon pre-existing debts."

In that case, the contractor had several contracts with Salt Lake City. He paid the proceeds of one contract upon a debt for materials used in a previous contract. An important distinction between that case and the instant one is that the court found that the contractor did direct that said moneys be applied to the pre-existing debts. It also found that the materialmen had no knowledge of the source of the money paid them. The surety contended that such payments should be applied to pay for the materials on the job from which the proceeds came, and thus exonerate the surety on the contract, rather than to permit the payments to be applied on materials used on a prior similar contract with Salt Lake City. Mr. Justice Cherry, speaking for the court, said at page 237 of the Utah report, at page 812 of 249 P.:

"The question is thus reduced to whether, in such circumstances, the application of payments so made by the parties is valid as against

the surety on the bond, or whether the surety  *  *  *  may require that such payments be applied on the particular indebtedness for which it is liable. There is a conflict of law upon the subject."

He then proceeded to discuss both lines of authority with respect to this proposition. Appellants state in their brief that the cases upon which they rely are listed in the O'Connor case. This is true, and it is also true that Mr. Justice Cherry concluded by rejecting the authorities cited and relied upon by the appellants herein, and by adopting and approving the contrary authorities which support the contention of the respondents. At page 242 of 68 Utah, at page 814 of 249 P., he stated:

"We are convinced that the better reasons as well as the preponderance of judicial opinion support the conclusions reached by the trial court."

That is, that the materialman was at liberty to apply the money to the old debt.

In view of the able and extensive review of the authorities on this matter by Mr. Justice Cherry in the O'Connor case, it would seem unnecessary to do other than make brief reference to them in this opinion. The distinction between this case and the O'Connor case, supra, as to the direction by the contractor to which debt the money should be applied is not the controlling factor, but knowledge or lack of it on the part of the materialman as to the source of the money paid him is by most courts regarded as extremely important.

The opinion in the O'Connor case, supra, cites with approval the case of *Sturtevant Co.* v. *Fidelity and D. Company,* 92 Wash. 52, 158 P. 740, L. R. A. 1917 E, 630, which makes a good statement of law on the subject, saying at page 742 of the Pacific Report:

"It is elementary law that: 'A creditor may apply a payment voluntarily made by a debtor without any specific appropriation, where there are two or more debts, to whichever debt he pleases.'  *  *  * Another exception to the rule  *  *  * obtains when the money

\* \* \* is known to the creditor to have been derived from a particular source or fund, in which case he cannot, without the consent of the debtor, apply it otherwise than to the exoneration of the source or fund from which it was derived."

The Washington court in upholding the creditor's right to apply the money as it saw fit, based its determination upon the fact that the creditor had no knowledge of the source of the money.

In Volume 41, A. L. R., at page 1291, the case of *Standard Oil Company* v. *Day et al.*, 161 Minn. 281, 201 N. W. 410, is reported. It is a suit wherein the surety sought to compel the application of funds realized from the contract to exonerate the debt for which the surety was liable. It is one of the leading cases and is cited by most other cases dealing with this subject. The case takes a much stronger position than the respondents herein contend for. The court held that even though the materialman knew that the money it received came from the original contractor, it could, pursuant to an understanding between the materialman and the subcontractor, apply the money to the extinguishment of a prior unsecured debt on the ground that the moneys so unconditionally paid to the subcontractor became its money to use as its own, and that the surety had no equity in the money and no right to direct the applications of payments. See also *People* v. *Powers*, 108 Mich. 339, 66 N. W. 215; *Crane Company* v. *Johnson, et al.*, 67 F. 2d 121, for cases adhering to the same rule. At the conclusion of the Day case at 41 A. L. R. page 1297 are listed numerous cases from various jurisdictions of the United States pro and contra this proposition. This annotation is supplemented in Volume 130 A. L. R., at page 198, et sequi, by many later cases.

In the latter annotation it is said at page 201:     9

"As stated in the earlier annotation, the fact of notice to, or knowledge on the part of the secondary creditor of, the source of the funds with which the secondary payment was made, is, in some of the cases previously cited, the crux of the decision,"

and continues, referring to the case of *Bay Lumber Company* v. *Pickering*, 120 Cal. App. 163, 7 P. 2d 371, 372, and quoting from that case, a good summary of the law as follows:

"The general rule [is] that in the absence of anything appearing as to the source of the fund from which the contractor makes the payments, a payment by [him] to a subcontractor or materialman to whom he is indebted on account of several buildings without any direction as to application, may be applied by the subcontractor or materialman as he desires * * *,"

and goes on to state that if the source of the money is known to the materialman, there is a conflict of authority as to how it must be applied. This latter question is not presented in this case.

In most of the cases where the court compelled the materialman to apply the proceeds of a contract to pay for the materials used therein, it will be found that there was some circumstance of fraud or collusion between the materialman and contractor to obtain an advantage over the property owner or the surety. These cases reason that not to so apply the payments to the job from which they proceed has the net effect of making the surety liable for a debt for which he is not a guarantor, and they allow him an equity in the proceeds. In the cases which hold to the contrary, it is pointed out that the foregoing doctrine had its origin in the days when sureties were gratuitous and were objects of special consideration by courts of equity. Sureties in modern business are quite able to take care of themselves. They select their own risks and can, by contract, maintain surveillance over the disposition of the funds received on the contract upon which they are surety. The misapplication of funds is one of the hazards of suretyship.

Most contractors and subcontractors must necessarily use some of the proceeds of current contracts in paying other obligations. It would improperly fetter business transactions unless they had the right to receive and deal with

their earnings as they saw fit, and for third parties to accept their money free from hidden equities. It would be extremely impractical for a materialman dealing with a contractor to be under the necessity of inquiring into the source of the money paid him, and equally impractical to require the materialman to apply the money to any particular job, unless he knew the source of it.

In this case, Campion was, by his contract, responsible for payment of the materials purchased by Sargent, and he could, with propriety, have required Sargent to furnish a bond to guarantee payment. It is also true that when Campion paid Sargent, the latter could have spent the money for food or clothing for his family, or for an automobile for his private use, or for any other purpose, and no complaint could have been made. When Sargent paid it to the materialman, he likewise accepted it without condition or restraint, and was at liberty to apply it to Sargent's general account, unless otherwise directed, and this was especially so because he did not know the source of the money.

In view of the definite findings of the trial court that there was no direction as to how the payment in question should be applied, and that the Supply Company did not know the source of the money, Campion and his surety have no right to compel its application to the sanatorium account.

The foregoing discussion should answer the question with respect to the remaining items of $103.40 and $455.71.

If the appellants are not entitled to have the $396.60 applied to the sanatorium account, they are certainly not entitled to have these items applied which were not even shown to have come from Campion's money. This is conclusively determined by the holding of our court in the case of *Board of Education* v. *Southern Surety Company,* 76 Utah 63, 287 P. 332, which was another case wherein the surety sought to compel the creditor to apply the proceeds of a contract to pay for the materials used on such contract. Our court held that the surety had no

such right, particularly in view of the fact that the surety in that case was not able to prove that the proceeds from the contract was actually paid to the materialman. The court states at page 72 of 76 Utah, at page 335 of 287 P.:

"The appellant claims that Mr. Adamson [the contractor] paid to the Frank M. Allen Company some of the money which he received from his contract for the construction of the Woodrow Wilson School building which was not credited to the payment of materials which went into the construction of that building. Upon this record appellant's claim in such respect may or may not be true. The evidence would not justify a conclusion either way. One who relies upon payment to defeat a cause of action must, to succeed, establish such fact by a preponderance of the evidence. The appellant has no lien upon the money which the board of education paid to Mr. Adamson. So far as appears, Mr. Adamson was at liberty to use the money which he received from the construction of the Woodrow Wilson School building as he saw fit. Appellant cannot escape liability because the money received from the contract was used by Mr. Adamson to pay obligations other than those growing out of his contract to construct the * * * School building."

On behalf of the appellant Sargent, it is asserted that the plaintiffs are barred and estopped from maintaining this action under the provisions of 104-9-2 and 104-9-3, Revised Statutes of Utah 1933, relating to counterclaims. The court found that on March 8, 1940, the defendant Sargent brought an action against the Supply Company, in which he sought to recover damages because the Supply Company had furnished him certain defective materials; he alleged that he had suffered damage to his business because thereof in the sum of $10,000. Sargent maintains that this suit for the purchase price of materials was one

"arising out of the transaction set forth in the complaint * * * or connected with the subject of the action"

of the former case. This contention is answered by the finding of the trial court. After finding that neither the Great American Indemnity Company nor Frank Campion

were parties to the former action, the court further found
as follows:

"The transaction set out in the Complaint of G. W. Sargent in his
action against the Mountain States Supply Company, a corporation,
was one which took place from April 1, 1937 to May 5 of the same year.
The transactions involved in the present case did not occur until about
18 months later. The two transactions are thus separate and distinct.
* * *"

From an examination of the judgment, this finding appears to be correct. That being the case, this cause of action
could not have been pleaded as a counterclaim in the former
suit brought by Sargent, and the plaintiffs are not barred
from now suing upon it; *Workman Motor Company* v.
*Pacific Finance Corporation,* 83 Utah 19, 26 P. 2d 961.

Campion and the Indemnity Company also contend that
the plaintiff is estopped from collecting at least $345. The
court found that Campion withheld that sum after the
completion of Sargent's contract, from May 1939 until
November 1939, before paying the same to Sargent,
and that when Campion paid this sum, he believed
that the Supply Company had been paid in full. It is contended that the Supply Company should have notified
Campion during this period that it had not been paid, so
that Campion could have saved himself at least this $345.
Appellants cite no authority in support of their position.

It is true as stated by our court in the case of
*Hilton* v. *Sloan et al.,* 37 Utah 359 at page 373, 108
P. 689, at page 694,

"It is almost unnecessary to add that mere inaction or silence may,
under peculiar circumstances, amount to both misrepresentation and
concealment,"

which may amount to an estoppel. This doctrine is referred to and approved in the later case of *Tanner* v. *Provo
Reservoir Company et al.,* 76 Utah 335, 289 P. 151.

It is generally held that in order for silence to work
an estoppel, there must be a legal duty to speak, or there

must be something willful or culpable in the silence which allows another to place himself in an unfavorable position by reason thereof. *See Eltinge* v. *Santos,* 171 Cal. 278, 152 P. 915, Ann. Cas. 1917 A. 1143. The facts in the instant case would not justify any such conclusion. It was the duty of Campion and the surety to see that the materialman was paid and it would seem logical that they, having this duty, should see that the duty was discharged before the funds were disposed of. It seems more in accord with good business practice that the contractor and his surety see that their own obligations are discharged than to require the materialman to inform the contractor that the subcontractor was not paying his bills.

The respondents make some assignments of error assailing certain findings made by the court as immaterial. Whether such findings are immaterial or not is now immaterial.

The judgment is affirmed with costs to respondents.

WOLFE, C. J., and LARSON and McDONOUGH, JJ., concur.

MOFFAT, J., concurs in the result.

WADE, J., having disqualified himself, did not participate herein.