**UNITED STATES of America, for the Use and Benefit of HYLAND ELECTRICAL SUPPLY CO., Appellee (Plaintiff),**

v.

**FRANCHI BROS. CONSTRUCTION CORP. and Maryland Casualty Company, Appellants (Defendants).**

No. 99, Docket 30611.

United States Court of Appeals Second Circuit.

Argued Oct. 28, 1966.

Decided May 23, 1967.

---

1. Fed.R.Civ.Proc., Rule 50.

Robert A. Erdmann, Burlington, Vt. (Wick, Dinse & Allen, Burlington, Vt., on the brief), for appellants.

Norman Hanfling, Chicago, Ill. (Joseph C. McNeil, Burlington, Vt., Samuel W. Fishman, Vergennes, Vt., on the brief), for appellee.

Before LUMBARD, Chief Judge, and MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

Appellant, Franchi Brothers Construction Corp. (Franchi), contracted with the United States, in October of 1962, to construct an ammunition storage facility (the storage facility) in Burlington, Vermont. Pursuant to 40 U.S.C.A. 270a et seq. (the Miller Act), Fránchi furnished the United States with a payment bond, naming Franchi as principal and appellant Maryland Casualty Co. (Maryland) as surety, conditioned on prompt payment to all suppliers of labor and materials for the construction.

Franchi engaged Fairway Electrical Contractors, Inc. (Fairway), as a subcontractor, to perform the electrical work on the storage facility. Between December 11, 1962, and August 21, 1963, Fairway purchased electrical supplies (total value of $18,647.38), for use in the construction of the storage facility, from the appellee, Hyland Electrical Supply Co. (Hyland), a company with whom Fairway had done business before and to whom it still owed money for supplies not connected with the Franchi contract.

Franchi's payment bond secured payment only for the electrical supplies sold by Hyland to Fairway for use in the construction of the storage facility.

In March of 1963, Fairway and Hyland requested Franchi to make any payments to Fairway for work done on the storage facility in the form of checks payable to Fairway *and* Hyland. Franchi was also requested to send the checks to Hyland. Thereafter, Franchi made out checks to Fairway and Hyland, but sent them to Fairway.

On June 7, 1963, the first such check, in the amount of $7,000, was sent by Franchi to Fairway. Fairway forwarded the check to Hyland on June 14, 1963, and asked Hyland to endorse it. Hyland did so and returned the check to Fairway. Fairway then sent two $2,000 checks of its own to Hyland with directions to apply one to reduce the indebted-

ness of Fairway for the supplies for the storage facility and to apply the other to reduce Fairway's past indebtedness on other accounts, unsecured by the Franchi-Maryland payment bond. The instructions given to Hyland by Fairway made it clear that the source of both checks was Franchi's payment to Fairway. In fact, Hyland admits having such knowledge.

Hyland then notified Franchi of the payment received from Fairway (whether Franchi was notified of the receipt of one or both of the $2,000 checks is not clear from the record), and later sent a copy of Hyland's ledger card for the storage facility supplies, showing the account had been reduced by $2,000.

Franchi sent a second check to Fairway (also made payable to Fairway and Hyland) on July 19, 1963, in the amount of $12,597. Fairway sent this check to Hyland with instructions to apply $7,000 to the Franchi account, "[o]ur portion of the check for labor to be applied to our regular account." Hyland deposited the $12,597 in its own account and notified Franchi of the receipt and application of these funds. Hyland also wrote to Fairway that "we will advise you as to what invoices this money must pay on this account." No proof of any such advice was offered.

Evidence was introduced that Franchi had sent a third check to Fairway, payable to Fairway and Hyland, in the amount of $4,000 or $4,500. Payment on this check was stopped when Franchi learned that Fairway was filing a petition in bankruptcy.

The total price for materials furnished to Fairway for the storage facility was $18,647.38. Hyland applied $9,000 to the reduction of that account pursuant to Fairway's instructions, leaving a balance of $9,647.38. As Fairway was unable to pay this balance, Hyland instituted the present suit against Franchi and Maryland on the payment bond, seeking judgment in the amount of $9,647.38.

Franchi's defense was that it had drawn checks totalling $19,597 payable

to Fairway and Hyland, and that Hyland was under an equitable obligation to apply the total amount of the Franchi checks in reduction of the secured debt. Thus, Franchi argues, its obligation to Hyland has been completely discharged.

After trial before the court, judgment was entered for Hyland against both defendants in the amount of $9,647.-38. In finding for plaintiff, the trial judge asserted two apparently alternative grounds for the decision.

The first ground was in the nature of an estoppel—because Franchi had "notice and knowledge of the amount and manner of the application of funds it paid to Fairway and Hyland," it was "estopped from contesting such application of the funds."

The second ground concerned the nature of the payments from Franchi. The court reasoned that the checks from Franchi payable jointly to Fairway and Hyland represented payments to Fairway for labor and materials; that the payments to Hyland from Fairway to be credited to the storage facility account represented that portion of the Franchi checks which was for materials; and that the remainder of the Franchi checks represented reimbursement to Fairway for labor costs already paid out of Fairway's funds from other sources. The court concluded that these funds in the nature of reimbursement were "free" and that Fairway could use them to discharge its obligations to Hyland incurred on jobs other than the Franchi job.

Franchi and Maryland appeal from this decision.

The trial judge was justified in accepting Blumenthal's (Hyland's vice-president) testimony that he informed Franchi of Fairway's directions as to the application of the checks in accordance with Fairway's wishes. But there is no proof that Franchi authorized its payments to be used for Fairway's other debts except as failure to take exception would imply authorization.

*The equities:*

The ultimate question is quite simple; the answer somewhat more difficult. What are the equities? The electrical work for Franchi on the particular job was to be performed by Fairway in Burlington, for which Franchi made payments to Fairway and its supplier, Hyland. Hyland supplied electrical material in the amount of $18,647.38. Hyland knew the source of the payments (Franchi) and wished to assure itself of some control over the payments (the joint name checks). Franchi paid Fairway and Hyland by the two checks $19,597 ($7,000 and $12,597). Hyland had possession of both Franchi checks and actually deposited in its own account $16,-597 of the funds provided by them. In short, Franchi had performed most if not all of its obligation, unless the law is to be that Fairway by its instructions to Hyland to divert Franchi's payments to Fairway's other obligations had the power to subject Franchi to double liability on its contract merely because Franchi with notice took no affirmative action.

 Certainly as to the surety, Maryland, the law does not permit such an unjust result. In Columbia Digger Co. v. Sparks et al., 227 F. 780 (9 Cir., 1915), the court affirmed a decision which followed the holding in Crane Co. v. Pacific Heat & Power Co., 36 Wash. 95, 78 P. 460, that a surety is not bound by the application of money paid for material furnished to an old account but only to the contract in discharge of its liability.

The paramount interest of equity in this field is shown in R. P. Farnsworth & Co. v. Electrical Supply Co., 112 F.2d 150 (5 Cir., 1940), rehearing denied, 113 F.2d 111, where the court said: "but when he pays them [the payments] over to a furnisher of materials for the job who knows their source, there is a duty to apply the money to the payment of those materials rather than to some other debt." (p. 153). To do so would be "to the prejudice of the principal and the surety in the bond, and if sanctioned

might cause great injustice." In United States for use of Carroll v. Beck, 151 F. 2d 964, 166 A.L.R. 637 (6 Cir., 1945), the court, stating the law in an action against the general contractor and his surety, said: "The federal cases, however, generally deny the debtor's power to control application, insofar as the interests of others are affected, when the creditor knows where the money comes from. This is sometimes grounded upon abstract considerations of equity and justice, and sometimes upon an implied contractual obligation to the surety and his principal, in cases bearing similarity to this [citing cases]."

The federal equity rule has been well expounded in United States for use & benefit of Crane Co. v. Johnson, Smathers & Rollins, 67 F.2d 121 (4 Cir., 1933), the court saying that when the payment was made to the creditor "with the identical money for the payment of which the surety is bound, or with the proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety, the application of the payment to some other debt, with or without the direction or consent of the debtor, does not bind the surety; at least if the source of the funds is known to the creditor or person receiving the payment [citing cases]." (p. 123).

In St. Paul Fire and Marine Insurance Co. v. United States, 309 F.2d 22 (8 Cir., 1962), the court reversed a judgment in favor of a plaintiff supplier and against the surety brought under the Miller Act. Despite certain features there (not present here) which weighed against the surety's position, the court said: "Nevertheless, we are impressed by what we feel is the overriding equity of the situation before us in favor of the surety and we conclude that this brings this litigation within the orbit of the Miller Act cases of *Farnsworth, Beck* and *Johnson.*" (p. 29); that "we do not see how we can avoid the holdings and implications of the Miller Act cases of *Farnsworth, Beck* and *Johnson.*" (p. 30); and that "In no Miller Act case of which we are aware

have *Farnsworth, Beck,* and *Johnson* been disavowed." (p. 30).

Thus, the case law supports the notion that, at least where the prime contractor has no notice as to how his subcontractor's supplier has applied funds, the source of which is the prime contractor, the supplier is under an equitable duty to apply the funds received to the secured account. However, in none of the cases cited above did the prime contractor have notice as to how the funds were being applied. In the instant case, therefore, the effect of Franchi's receipt of notice as to Hyland's application of the funds must be determined. We believe there are two alternative ways of approaching this added element of notice, each requiring a similar analysis of the facts and each leading to the same result.

The first approach is, does the added element of notice substantially shift the equities from Franchi to Hyland so that it might be said that upon *all* the facts, no equitable duty arose on the part of Hyland to apply the funds received only to the secured debt? The second approach to the problem is to ask, assuming the presence of an equitable duty on the part of Hyland to apply the funds to the secured account, does the fact of notice to Franchi work as an equitable estoppel on Franchi preventing it from asserting the equitable duty imposed upon Hyland? We believe that the same inquiry must be made to answer either question, namely: What is there, if anything, in Hyland's notice to Franchi that adds to Hyland's equities in this litigation? This issue can be analyzed in terms of equitable estoppel. Such an analysis, in our view, demands a negative answer to the question stated under the first approach as well as to that stated in the second approach.

The doctrine of equitable estoppel is well known in the law, and the principles which govern its application have been thoroughly explored and expounded. The various contexts in which it has appeared have given rise to numerous distinctions, both real and illusory. However, certain elements have been almost universally recognized to be prerequisites to an application of the doctrine in any case or context.

Judge Learned Hand enunciated one such bedrock principle in Helvering v. Schine Chain Theatres, 121 F.2d 948 (2d Cir. 1941):

"* * * there was no basis for an 'estoppel,' however broadly one uses that disastrous word. This is true because, however, nebulous, it has always had at least this solid center; that the party who invokes it shall have acted to his detriment in reliance upon what the other party has done." 121 F.2d at 950.

The principle that a party seeking to invoke the doctrine of equitable estoppel must show that he has been prejudiced by his reliance on the conduct of the party sought to be estopped has been recently reiterated in this and other circuits. Freedman v. The Concordia Star, 250 F.2d 867, 869 (2d Cir. 1958); First Insurance Co. of Hawaii v. Chapman, 355 F.2d 49, 52 (9th Cir. 1965); Royal Air Properties, Inc. v. Smith, 333 F.2d 568, 570 (9th Cir. 1964).

Hyland has not shown, indeed has not at any time alleged or claimed, that it relied to its detriment upon Franchi's silence or "acquiescence" in any way. As for the unsecured debts, Hyland has made no claim or showing that any possible methods of collecting them, now foreclosed because of Fairway's insolvency, were passed up at the time by Hyland's reliance on Franchi's failure to object to the use of some of the storage facility funds for that purpose.

■ Thus we conclude that Hyland has failed to establish the necessary element of prejudicial reliance on Franchi's silence, and that Franchi is entitled to assert the equitable obligation imposed upon Hyland by way of defense to this suit, which under the federal cases overrides estoppel unless prejudice is affirmatively shown.

*The "free funds" theory:*

■ We also reject the second ground adopted by the trial court for its

decision, i. e., that the Fairway to Hyland payments, applied to the old, unsecured debts, came from free funds representing reimbursement of Fairway by Franchi for labor expenses already paid.

In his "Conclusions of Law," the trial judge found that "The payments made by Franchi to Fairway and Hyland jointly were for labor and material furnished in the performance of the contract between Franchi and Fairway," and that "Upon receipt of these checks, Fairway paid Hyland for the materials used in the Burlington job." The difficulty with these conclusions is that there is no supporting proof. Obviously, upon receipt of the checks ($19,597), Fairway did not pay Hyland for its material ($18,647.38). By Fairway's direction, Hyland applied only $9,000 to its Burlington job bill. There was no proof that the balance of the Franchi payments "reimbursed Fairway for its labor or other costs" or that it constituted "free funds" for Fairway. Hyland knew when it endorsed the $7,000 check and applied only one of the two $2,000 checks to the Burlington job that the Fairway balance was $13,862.07, and when Hyland deposited the $12,597 check in its own account, the debit balance was over $15,000. There could scarcely have been any "free funds" for Fairway.

██ Even if the findings were supported by the record, the trial court's second ground for decision would fall, as it is based on an erroneous view of the law. With respect to funds which have come from the surety to the debtor, and which the creditor knows have originated in the surety, the duty of the creditor to apply debtor-to-creditor payments of those funds to the guaranteed debt is not limited to funds which came from the surety solely for the purpose of paying the specific, guaranteed debt (e. g., for materials), but extends to all of the "proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety * * *" which are paid over to the creditor. United States for the use of Crane Co. v. Johnson, Smathers & Rollins, supra, 67 F.2d

at pp. 123–124. See also, St. Paul Fire and Marine Insurance Co. v. United States, supra, 309 F.2d at p. 28. Thus, all payments made by Franchi to Fairway pursuant to the contract for which Hyland supplied materials are subject to the equitable obligation.

*Conclusion:*

██ It remains to determine, in the light of the above discussion, the extent to which Franchi and Maryland are liable to Hyland. Had Hyland applied the full amount of the two Franchi checks to the reduction of the storage facility account, the liability of the sureties (Franchi and Maryland) would have been extinguished. However, within the field of equity, consideration must be given to Hyland's position as to the original $7,000 check. It did not deposit it in its own account. Nor could it have done so, lacking Fairway's endorsement. The only funds resulting therefrom available for its use were the two $2,000 checks received from Fairway. Therefore, although Hyland, knowing the source of the Fairway payments, did not have the privilege of honoring Fairway's directions to the detriment of Franchi and Maryland, nevertheless Hyland could make such application only as to funds within its control, namely, the two $2,000 checks ($4,000) and the $12,597 check. The credit to the Fairway-Burlington job account could only have been $16,597, which would have left a balance due of $2,050.38.

Under the applicable law, Franchi and Maryland are entitled to be relieved of any obligation to Hyland for materials supplied for the storage facility job to the extent of $16,597. The judgment should be modified by reducing it to $2,050.38 and, as so modified, the judgment is affirmed.

IRVING R. KAUFMAN, Circuit Judge (dissenting):

While I agree with my brother Moore that the simple question to be asked is "What are the equities?", I find myself unable to concur in his reslution of that inquiry. The difficulty with the ma-

jority's rationale is that it does not seem to recognize that the heavy duty it imposes on Hyland with respect to the application of Franchi's payments is an *exception* to the general rules governing the apportioning of payments where several debts are owed by the debtor to the same creditor. These general rules are clearly set forth in the *St. Paul Fire and Marine Ins. Co.* case cited by the majority and are contained in § 387 of the Restatement of Contracts:

(i) The payment is applied as the debtor intends and so manifests to the creditor before or at the time of payment.

(ii) If the debtor fails so to indicate, the payment is applied as the creditor, within a reasonable time, determines.

(iii) If neither the debtor nor the creditor seasonably so indicates, the payment is applied as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied. This usually results in its application to the oldest unsecured account. 309 F.2d at 25.

Adapting these guidelines to this case, it seems to me that since Fairway, the debtor, instructed Hyland, the creditor, how to allocate the Franchi checks, Hyland acted properly when it followed those instructions.

There is, as I have indicated, an exception to the general rules set forth above, and it is this treatement, *sui generis* in character, which the majority would utilize in this case. The anomaly, recognized by the court in the *St. Paul Fire and Marine Ins. Co.* case, is contained in § 388 of the Restatement of Contracts which provides:

### LIMITATION OF THE PAYOR'S POWER OF CONTROLLING APPLICATION

If the payor is under a duty to a third person to devote money paid by him to the discharge of a particular debt the payment must be so applied *if the creditor knows, or has reason to know, of the payor's duty,* in spite of the fact that the payor directs that the payment shall be applied to the discharge of another debt. (Emphasis added.)

In order to determine whether this exception is properly adaptable to the present case, therefore, we must ask whether Hyland knew, or had reason to know, that Fairway had a duty to apply the Franchi checks toward payment for the Burlington storage facility materials supplied by Hyland. Although the majority opinion seems to realize that this query is appropriate, it proceeds to merge the issues of duty and estoppel in the same "general inquiry," and this in fact appears to have resulted in an examination only of those principles governing the doctrine of estoppel.

I would suggest instead that quite different considerations should determine whether Hyland had a duty to use the funds it received from Fairway solely for the purpose of reducing the Burlington project account, and that we need not deal with the question of whether Franchi should be estopped from asserting Hyland's equitable duty simply because the facts in this case indicate that no such duty existed. The majority recognizes that "the case law supports the notion that, at least where the prime contractor has no notice as to how his subcontractor's supplier has applied funds, the source of which is the prime contractor, the supplier is under an equitable duty to apply the funds received to the secured account." But, my brothers also know that in not one of the cited cases did the prime contractor have notice that the funds were in fact being applied to a different account. These cases are, therefore, dubious authority, and cannot be relied on to support the diverse proposition that when the prime contractor does have such knowledge, as it did here, an equitable duty still binds the supplier to apply the funds to the secured account.

It is undisputed that Hyland sent its ledger cards to Franchi, indicating clearly the amount by which the Burlington project account had been reduced. This knowledge on Franchi's part is crucial, because Hyland was required to apply

the total amount of the checks to the Burlington project account only if it "[knew] or had reason to know" that Fairway was under a duty to Franchi to apply those checks to that particular account. See Restatement of Contracts § 388, supra; Corbin on Contracts, § 1231. But, the evidence is clear that when Franchi learned from the Hyland ledger cards that only a *portion* of the checks had been applied to the storage facility account, it never voiced any objection to Hyland; instead Franchi continued to forward its checks and to acquiesce in the way these payments were being applied. Under these circumstances it cannot be said that Hyland had "reason to know" that Fairway was under an obligation to use those checks only to reduce the Burlington account; and, since actual or implied knowledge of Fairway's duty was non-existent, the rule set forth in § 388 of the Restatement of Contracts was inapplicable, and no duty was imposed on Hyland to apply the funds only to the secured account. Hyland, therefore, acted properly when it followed Fairway's orders and should recover, as Judge Gibson held, the monies never paid for the materials supplied to construct the storage facility totaling $9,647.38.

I should add that I do not agree with the majority that finding Franchi liable for this amount would subject it to "double liability." The evidence indicates that Franchi has not paid for the materials in question. The total value of the electrical supplies purchased by Fairway was $18,647.38. The two Franchi checks actually paid totaled $19,597. A third check for $4000 or $4500 was also forwarded although payment was stopped when Franchi learned of Fairway's petition in bankruptcy. Since the total amount of the 3 checks far exceeded the amount due for materials, it is evident that the checks were intended not only to pay for the materials in question, but also to compensate Fairway for the labor it had furnished in connection with the project. And, I believe it is fair to infer from Franchi's acquiescence in the manner in which the checks were applied, that only $9000 of the first 2 checks was intended to pay for materials supplied by Hyland.

While I would affirm Judge Gibson's judgment as to Franchi, I would reverse his holding with regard to the surety, Maryland Casualty. There is nothing in the case to indicate that the funds which Franchi forwarded to Fairway were not related to the Burlington project. The cases cited by the majority clearly indicate that Maryland was entitled to have those funds applied against the debt for which it was acting as surety. Since there is no evidence that Maryland was aware of the misapplication of the funds it should not be bound by Franchi's acquiescence, and should be relieved of its obligations under the surety contract.