**GRAHAM PAPER COMPANY, a corporation, Appellee-Cross-Appellant,**

v.

**SCHOTTCO CORPORATION, a corporation, Appellant-Cross-Appellee.**

**Nos. 76–1737, 76–1804.**

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1977.

Decided May 17, 1977.

Joseph J. Becker, Clayton, Mo., on brief for appellant.

J. L. Pierson, St. Louis, Mo., for appellee; Margaret Howard, St. Louis, Mo., on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

In this cause of action Graham Paper Company, a Missouri corporation, sued Schottco Corporation, an Ohio corporation, for money allegedly owed to Graham on a past due account. Jurisdiction was based on diversity and an amount in controversy exceeding $10,000. Graham Paper Company was successful in the trial court, Schottco having failed to convince the district court that its order of *40,000 pounds* of brick wrap, which was far in excess of Schottco's needs, was based on a unilateral mistake about which Graham Paper Company knew or should have known. We agree with the conclusion of the district court and affirm.

Appellant Schottco Corporation operates a brick plant in Galesburg, Illinois through its division, the Galesburg Brick Company. At the time of the sales transaction in question Mr. Donald Nelson served as corporate manager of the brick plant, and Mr. Roland Cobb served as a sales representative for the paper company. Brick wrap is a paper product used to protect the exposed edges of bricks during shipment.

The stipulation of the parties establishes conclusively that Mr. Nelson prepared and mailed a written order to Mr. Cobb on September 30, 1974, for 40,000 pounds of No. 50 black brick wrap, that the contract was executed by Graham Paper Company, and that a $24,793.22 bill on that sale remains unpaid. Due to the specially cut size and the use of newer methods by other brick companies there is no alternative market for the excess brick wrap. The parties by stipulation agreed to the following facts:

1. On August 15, 1974, plaintiff's salesman, C. Roland Cobb, sent a written quotation (Ex. 1) to defendant regarding No. 50 black brick wrap to be specially cut in three-inch by thirty-nine inch strips.

2. In conjunction with the possible sharing of a truckload of said brick wrap by defendant and Peoria Brick Company, Cobb sent a written quotation (Ex. 2) to Mr. Carney at Peoria Brick Company regarding said brick wrap on August 23, 1974.

3. On September 30, 1974, defendant's plant manager, Donald L. Nelson, telephoned Roland Cobb and ordered brick wrap.

4. Nelson prepared and mailed to Cobb a written order (Ex. 3), numbered 44–74, dated September 30, 1974, for 40,000 pounds of No. 50 black brick wrap cut in strips as mentioned above.

5. Cobb forwarded the order to plaintiff's office in St. Louis, and on or about September 30, 1974, plaintiff sent a written acknowledgement to defendant for

the order of 40,000 pounds of said brick wrap (Ex. 4).

6. The brick wrap was delivered to defendant on or about December 16, 1974.

7. After receiving the shipment and the invoice, Nelson promptly called Cobb, claimed that a mistake had been made, and rejected shipment.

8. Both parties have made attempts to dispose of the wrap to other brick manufacturers but have only been able to sell a small percentage of the total.

9. Plaintiff mailed an invoice to defendant for the brick wrap in the amount of $26,503.10 on or about December 16, 1974. After set-offs for brick wrap sold by the parties there is still unpaid on this amount $24,793.22.

Appellant has contended, however, it has a defense to the contract which relieves it of the obligation to pay; the 40,000 pound order was *ten times* Galesburg's requirement for brick wrap, and the brick company argues that Graham, through its salesman Cobb, knew or must have known of Nelson's *error* in ordering that large quantity.

However, the trial judge, as the trier of fact concluded:

Defendant's plant manager made a mistake in the amount of brick wrap which *was needed by the plant* in question and ordered approximately ten times too much material.

(Emphasis added.) That finding was obviously made by the trial court because of the considerable conflicting testimony as to whether, when Nelson computed the plant's needs, he ordered *96,000 or 960,000* specially cut 3″ × 39″ pieces of brick wrap. Testimony showed that Galesburg used eight brick wrap strips per 1,000 bricks and that its maximum annual production was about 12 million bricks. Computed correctly, Galesburg required at most 96,000 strips annually. In the 40,000 pound truckload which was ordered there are approximately 1,143,-000 strips of brick wrap. Galesburg Brick Co. did plan to sell some amount of brick wrap over its own needs to another manufacturer, Peoria Brick and Tile Co., in order to obtain the lower truckload price.

The crucial and conflicting testimony concerns the computations Nelson made and the information which Cobb provided or failed to provide to Nelson concerning the order. Cobb testified that Nelson computed that he would require 960,000 pieces of brick wrap; that Cobb later in his office figured out that the total number of pieces in a truckload was over 1,000,000 and informed Nelson of that fact; that Cobb also told Nelson that he would contact Peoria Brick and Tile Co., another brick manufacturer, about buying some of the overage, and that after contacting Peoria he further told Nelson that Peoria "could and would take some." Both Cobb and Nelson agree on the point that the actual sale to Peoria would be made between Peoria Brick and Tile Co. and Galesburg Brick Co., and that Graham's sale was to Galesburg only.

Cobb conceded at trial that neither the quotation he provided to Nelson, Nelson's purchase order, nor Graham's acknowledgement could reveal the total dollar amount for a truckload or the total number of pieces.[1]

Trial exhibit W supports the contention that Cobb did figure out the number of pieces in a 40,000 pound truckload. Cobb testified that he did *not* figure out the total truckload price, and was not aware of it, *prior* to September 30, 1974, when the order was placed. Both parties agree they did not *discuss* what the total price for the truckload would be prior to placing the order.

Nelson's version of the discussions prior to the placement of the order was that he told Cobb that Galesburg ran an average of 8–12 million bricks a year; that Nelson wanted to purchase enough brick wrap to wrap eight million bricks a year (64,000 pieces); that Cobb *never* told Nelson how many pieces were in a truckload; and that

---

1. The August 15, 1974, quotation stated the price in terms of $2.90 per C sq. feet ($23.56 per M sheets).

Cobb told him that Peoria had agreed to take the *difference* to make up a truckload. Nelson testified on direct that he made the computation of 96,000 pieces and *ordered* 96,000 pieces. Nelson further testified that he didn't have any idea how much of the brick wrap would have to be disposed of to the Peoria Company to make a truckload; that he knew that Galesburg, not Graham, was making the sale to Peoria, and that he (Nelson) had never called Peoria prior to making the order. On cross-examination, Mr. Nelson testified that he needed 64,000 pieces and ordered 96,000 pieces, and that what he meant was that Galesburg needed 64,000 pieces but that he figured between Galesburg and Peoria they could put out 12 million bricks a year. He reiterated that he never was told nor did he ask *how many* pieces made up a truckload, but that somehow 96,000 pieces is what he decided to order. Nelson asserted that he relied on Cobb that Cobb had assembled a truckload with Peoria. Nelson's testimony also establishes that the brick company was in poor financial condition at the time of this transaction and ceased brick manufacturing on December 1, 1974.

■■■■ The documentary evidence and exhibits provide little guidance in resolving what quantity Nelson computed and ordered; oral testimony must be chiefly relied upon. The trial judge was in a position to assess the witnesses and to listen as they testified. The appellant carries the burden of demonstrating clear trial court error.

> [T]he complaining party has the burden to clearly demonstrate error in the court's findings. This is a strong burden where, as here, the findings are primarily based upon oral testimony and the trial judge has viewed the demeanor and credibility of witnesses. *Chalk v. Beto*, 429 F.2d 225, 227 (5th Cir. 1970); *St. Louis Typographical Union No. 8 v. Herald Company*, 402 F.2d 553, 557 (8th Cir. 1968), and cases cited therein.

*Salomon v. Crown Life Insurance Co.*, 536 F.2d 1233, 1238–39 (8th Cir. 1976), *citing Snodgrass v. Nelson*, 503 F.2d 94, 96 (8th Cir. 1974). Based on the record as we have

described it, we cannot say that the trial court clearly erred in deciding that Nelson made the mistake in determining his requirement and ordering ten times too much material. Nor do we disagree with the conclusion that Schottco failed to establish that Graham was aware of or should have been aware of the unilateral mistake.

*Frederich v. Union Electric Light & Power Co.*, 336 Mo. 1038, 82 S.W.2d 79 (1935), cited by Schottco, establishes that

> Reformation, and ordinarily rescision or cancellation, is only granted where there is a mutual mistake. However, there are exceptions made to these general rules in cases where the mistake of one party is either known to the other party or is so obvious, under the circumstances, that it must have been known to him, and the mistake concerns a matter so vital that it can be said that the parties, because of miscalculation or false information, never actually agreed to the same proposition. The rule applicable to this kind of a case is stated in 6 R.C.L. 623, § 42, as follows: "If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation, and the other party, realizing that a mistake must have been committed, takes advantage of it, and refuses to let the mistake be corrected when it is discovered, he cannot, under these conditions, claim an enforceable contract. Where there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract."

*Id.* at 1052; 82 S.W.2d at 86. The evidence here does not reveal such an "obvious" mistake that it "must have been known." The undisputed evidence is that Cobb had no familiarity with the brick business; he testified that he could not tell from his observation and tour of the plant its brick wrap requirements. Cobb had never sold brick wrap to Galesburg, or anyone else, prior to this sale. He testified that he never discussed the total dollar amount involved in

the sale with his home office. Mr. Harold Riem, Graham general credit manager, testified that the credit for $26,000 was extended to Galesburg because of "previous experience for a period of several years * * * all of which was satisfactory * * * ." He also said the order in that amount was not unusual for a customer of defendant's size.

However, despite Cobb's vague testimony to the contrary on direct examination, there is documentary and testimonial evidence that Nelson had told Cobb the *elements* of the brick wrap computation. On cross-examination Cobb admits he learned of the eight pieces per 1,000 brick figure from Nelson at the same time Nelson mentioned 12 million bricks, before the order was placed. Still, the uncontroverted testimony is that Nelson made the calculation, and Cobb testified that he never checked Nelson's figures. This evidence is not sufficient to clearly indicate that Cobb *knew* of Nelson's error, or that the computational error should have been any more obvious to Cobb than it was to Nelson. The trial court is affirmed with respect to its factual conclusions and the decision favoring Graham Paper Company.

*Cross-Appeal*

The cross-appellant, Graham Paper Company, has appealed from a judgment of the district court denying it interest on the past due account. We reverse, and remand to the district court to determine the correct amount of interest due and payable under Mo.Ann.Stat. § 408.020.

■ Interest is awarded here under the Missouri statute rather than pursuant to the alleged "agreement" of the parties to assess a one percent per month service charge on overdue accounts. Contrary to the paper company's assertion, the court is unwilling to conclude that the one percent per month service charge, found in small print on the seller's form sent to acknowledge the order, became part of the contract under Mo.Ann.Stat. § 400.2-207 [U.C.C. § 2-207]. It is the court's view that the written proposal dated August 15, 1974, and signed by Mr. Cobb constituted an offer which Mr. Nelson, first by phone and then by written order, accepted on the brick company's behalf.

In this transaction Mr. Cobb asked for the opportunity to quote to Mr. Nelson on Galesburg's specially sized brick wrap requirements. After consulting with his office, Cobb submitted a "written confirmation of the quotation" on the brick wrap. The written confirmation which Cobb signed and dated specifically mentioned the quantity, the specially cut size, the price, delivery method, approximate delivery time and "terms." The terms did *not* include the one percent service charge printed on the seller's acknowledgement form but did show terms of "1% 10 net 30." Cobb testified that he felt the price quoted on this shipment was a firm price up to a certain date. Nelson testified that he copied the price, size and quantity from the August 15, 1974, quotation in making out the purchase order. He placed the order by phone to Cobb, but Cobb requested a "written confirmation." [2]

■ Interest is therefore awarded in the sum of six percent as provided in Mo.Ann. Stat. § 408.020.

Affirmed in part, reversed in part, and remanded in accordance with this opinion.

---

**2.** A similar offer was made in *Jorgensen Co. v. Mark Construction, Inc.,* Haw., 540 P.2d 978 (1975) where "[t]he quotation set forth all the terms necessary to constitute a binding contract upon acceptance." 540 P.2d at 981. The offer was accepted by the buyer's *purchase order.*