**SCHOOL DISTRICT OF SPRINGFIELD R–12, ex rel. and for the Use of MIDLAND PAVING COMPANY, Plaintiff-Appellant,**

v.

**TRANSAMERICA INSURANCE COMPANY, Defendant and Third-Party Plaintiff-Appellant,**

v.

**DeWITT–NEWTON, INC., DNS Leasing Company, W. E. DeWitt, Jr., and Daphna E. DeWitt, J. F. Stiefvater and Janet Stiefvater, John L. Newton and Catherine B. Newton, Joseph W. Newton and Mary T. Newton, Third-Party Defendants and Fourth-Party Plaintiffs-Appellants,**

v.

**Everett JACKSON, Fourth-Party Defendant-Respondent.**

Nos. 11566, 11571 and 11572.

Missouri Court of Appeals,
Southern District,
Division Two.

April 19, 1982.

Motion for Rehearing or Transfer Denied
May 10, 1982.

Application to Transfer Denied
June 14, 1982.

Thomas Strong, John Wooddell, Strong & Placzek, Springfield, for plaintiff-appellant.

David W. Hall, Jr., Bussell, Hough & O'Neal, Springfield, for defendant and third-party plaintiff-appellant.

Flavius B. Freeman, Neale, Newman, Bradshaw & Freeman, Larry K. Bratvold, Shepard & Bratvold, Springfield, for third-party defendants and fourth-party plaintiffs-appellants.

HOGAN, Judge.

This is a materialman's action brought upon a public contractor's bond. Because the performance and payment bond was executed by DeWitt-Newton (the prime contractor) pursuant to the requirement of § 107.170, RSMo 1978,[1] this litigation was instituted by the obligee as provided by § 522.020, but Midland Paving Company is the real party in interest and we shall refer to Midland as the plaintiff.

Plaintiff sued the surety, defendant Transamerica. Under the provisions of Rule 52.11(a), the surety impleaded the prime contractor and a group of indemnitors; these parties defendant in turn impleaded Everett Jackson, the subcontractor to whom the materials were furnished. Sundry conflicting claims, crossclaims and counterclaims were interposed by the parties and by December 18, 1978, the cause stood at issue. After a 4-day bench trial, the court found, in essence: 1) that the plaintiff should have and recover judgment against the surety in the amount of $5,879.23, with interest at the rate of 6 percent per annum; that the surety should stand indemnified and should recover over

---

1. All references to statutes and rules are to RSMo 1978 and Missouri Rules of Court (9th ed. 1978), except where otherwise specifically noted.

against defendants DeWitt-Newton and the individual third-parties defendant in the amount of the judgment rendered against the surety, together with the sum of $12,-000.00 stipulated as fair and reasonable attorney's fees incurred by the surety,[2] and 2) that DeWitt-Newton and the other third-parties defendant recover over against Jackson, the subcontractor.

All the parties except Jackson, who defaulted, have appealed. The appeals were consolidated for purposes of argument, but will be considered separately to the extent that the contentions presented differ. We must note, in candor, that the case was presented—perhaps of necessity—in confounding detail. At plaintiff's request, the trial court made extensive findings of fact and conclusions of law. We readily acknowledge the utility and clarity of those findings although we shall not set them forth in detail. We confine ourselves to a recitation of those facts and a consideration of those issues essential and necessary to a proper resolution of the appeals. See *Bloomfield Reorganized School Dist. No. R–14 v. Stites*, 336 S.W.2d 95, 97 (Mo.1960); *Southwest Engineer. Co. v. Reorganized Sch. Dist. R–9, Lawrence County*, 434 S.W.2d 743, 746 (Mo.App.1968).

The appeals are focused upon the performance of and payment for a single subcontract awarded by the prime contractor during the construction of a high school building. At some time prior to May 27, 1970, the Springfield School District R–12 determined that a fifth high school was necessary. The prime contract was let to DeWitt-Newton for $1,828,400.00 and the bond required by § 107.170 was executed. The high school building was built on or near the old Kickapoo prairie south of Springfield, was later named Kickapoo High School and during the trial, the witnesses referred to the building as "Kickapoo."

On September 29, 1970, DeWitt-Newton let a subcontract for asphalt paving to defendant Jackson, who did business in his own name and as D. O. Allen Asphalt Paving. The subcontract calls for asphalt paving and installing the materials for a "Red Dog" track; as explained upon trial, it included paving the parking lots, driveway and tennis courts and the installation of the track at Kickapoo. The contract price for the paving was $47,300.00; the "red dog" installation cost was $1,900.00. It is readily inferable that the work Jackson had to do was substantially complete by the end of October 1971, although he was required to repair and resurface the tennis courts during the summer of 1972.

On October 25, 1971, Jackson submitted an invoice requesting a progress payment in the amount of $44,935.00. DeWitt-Newton remitted the sum of $40,441.50, the amount due less 10 percent retainage. On November 18, 1971, Jackson paid plaintiff the sum of $20,000.00 which was credited to Jackson's open account. Jackson submitted another request for a progress payment on November 26, 1971, which was refused because the tennis court surfaces were not satisfactory to the prime contractor. Jackson was given an extension of time and the tennis courts were resurfaced. In September 1972, Jackson requested his retent payment. By check dated September 8, 1976, DeWitt-Newton remitted Jackson's retainage in the amount of $7,048.50, plus $30.00 in payment of a charge simply noted on the check as "# 1305." On September 11, Jackson paid plaintiff $10,000.00 by check. The check bears the legend: "FOR *On Account*." This check was also credited to Jackson's open account. The trial court held that the payment of $20,000.00 should have been credited to that part of Jackson's account incurred in the performance of the Kickapoo subcontract, but the retainage payment was properly credited to Jackson's

2. This judgment over against the prime contractor and the other third-parties defendant is based on an agreement of indemnity executed by the third-parties defendant in consideration of Transamerica's execution of the payment and performance bond as surety. The agree-

ment was received in evidence as Exhibit W, which is not before us, but neither Transamerica's right to indemnity nor the amount of the attorney's fees incurred are in issue on this appeal.

open account. Several ancillary questions have been briefed but the trial court's allocation of these two payments is the principal matter in dispute.

■ Appeal number 11566 is the plaintiff's appeal. Although the defendants have not specifically briefed the point, a plaintiff's appeal ordinarily puts the submissibility of the case in issue. Usually our courts have applied this principle to cases tried to a jury, holding that trial errors are immaterial if the plaintiff made no submissible case. *Osborn v. McBride*, 400 S.W.2d 185, 188[1] (Mo.1966); *O'Dell v. Dean*, 356 Mo. 861, 863, 204 S.W.2d 248, 249[1] (1947). A similar rule applies in court-tried cases; if a plaintiff has failed to prove his right to recover any sum, he cannot have been prejudiced by the trial court's rulings limiting the amount of recovery. *Laclede Land & Improvement Co. v. Schneider*, 177 S.W. 388, 390[6] (Mo.1915); *State ex rel. Brown v. Hamilton*, 202 Mo. 377, 386, 100 S.W. 609, 611 (1907). So, we consider first the contention of both defendants that the trial court erred in applying Jackson's payments so as to avoid payment for the materials on the Kickapoo project because it was impossible to separate Jackson's purchases into separate job accounts and there was no basis for making an application of payments other than to apply the payments first to the oldest purchases. As developed, particularly in defendant DeWitt-Newton's brief, this point amounts to an argument that the items shown on Jackson's account with plaintiff were so commingled that it could not be determined what materials went into the Kickapoo project or the manner in which Jackson's payments should be credited. Defendants Transamerica and DeWitt-Newton have cited *Herrman v. Daffin*, 302 S.W.2d 313 (Mo.App.1957), which the trial court cited in its memorandum opinion.

The point is not without merit. Defendants' argument that there is no identifiable debt allocable to the Kickapoo paving project because plaintiff's invoices for materials do not identify the project in which they were used or consumed is not as impressive as it may appear to be at first glance. It cannot be said that the items of Jackson's account were capable of *easy* separation, which is the language of some of the precedents, e.g., *C. A. Burton Machinery Co. v. National Surety Co.*, 182 S.W. 801, 804 (Mo.App.1916); the invoices do not show precisely what materials went into the Kickapoo project, as was the case in *Fidelity & Deposit Co. v. John Gill & Sons Co.*, 270 S.W. 700, 703[2] (Mo.1925). Even so, plaintiff's action was based on its dealings with a single contractor and its failure to allocate the items of its account to discrete projects was not fatal to its recovery. *Campbell Glass & Paint Co. v. Davis-Page Planing Mill Co.*, 130 Mo.App. 474, 478, 110 S.W. 24, 25 (1908). We are more concerned with the requirement that the plaintiff prove the materials it furnished were actually incorporated or consumed in the Kickapoo project. *Public Water Sup. Dist. No. 8 of Jefferson County v. Maryland Casualty Co.*, 478 S.W.2d 293, 299[5] (Mo.1972); *Wiss v. Royal Indemnity Co.*, 219 Mo.App. 568, 575, 282 S.W. 164, 165[3] (1926).

■ The standard by which the trial court's finding must be measured is whether the reviewing court's reading of the whole record generates a firm belief that the judgment is wrong. Rule 73.01(c), Missouri Rules of Court (13th ed. 1982); *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976). And, in this bench-tried case, the plaintiff is entitled to the benefit of all the evidence, even though defendants' motion to dismiss at the close of plaintiff's case pursuant to Rule 67.02 was not the equivalent of a motion for directed verdict. See *Duval v. Midwest Auto City, Inc.*, 578 F.2d 721, 724[1–3] (8th Cir. 1978); *Wealden Corporation v. Schwey*, 482 F.2d 550, 551–552[4] (5th Cir. 1973); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2371, p. 221 (1971).

Plaintiff was at laborious pains to prove the continuous status of Jackson's account at all times between June 7, 1971, and December 31, 1978. As proof thereof, plaintiff offered two ledger cards and a series of computer printouts. The ledger sheets are

before us as plaintiff's exhibits 18, 21 and 22. It is true, as defendants maintain, that these ledger sheets indicate the status of Jackson's account with plaintiff, that they reflect all the charges and credits from June 7, 1971, through December 31, 1978, and that no entry appears anywhere on these ledger cards designating the particular project to which the materials were allocable, nor any point of delivery. As much may be said of plaintiff's exhibits 23, 24 and 25—computer printouts, admitted without objection—which, respectively, showed the status of Jackson's open account for the years 1974, 1975 and 1976.

Documentary proof of Jackson's account chargeable to the bond was made by the introduction of plaintiff's exhibit 19. Exhibit 19 consists of six invoices sent to Jackson during the month of October 1971. These invoices show that plaintiff billed Jackson for materials in the amount of $29,480.58 in October 1971, but again there is no job designation.

A third species of proof introduced by plaintiff was the original memoranda of sale, which plaintiff's managing officer called "weight tickets." These weight tickets—before us as plaintiff's exhibits 38 through 52—were made up at the plaintiff's scale when materials were delivered and became the basis for the invoices which in turn were posted on the ledger sheets. A few of the weight tickets bear the legend "Kickapoo," but it stood admitted upon trial that plaintiff had no knowledge where the materials sold to Jackson went, nor for what purpose they were used.[3] So, if we accepted defendants' premise that plaintiff was obliged to show incorporation or consumption of the materials by some legend inscribed on the memorandum of sale, or even by showing delivery at the alleged place of use, *City of Springfield ex rel.*

*Horton v. Koch,* 228 Mo.App. 511, 517, 72 S.W.2d 191, 194[3] (1934), we would be obliged to accept the contention that the accounts were so commingled that no particular part of Jackson's account could be allocated to the Kickapoo building project.

There is, however, another side to the coin. In our view, neither *Fidelity & Deposit Co. v. John Gill & Sons Co., supra,* 270 S.W. at 703; *Herrman v. Daffin, supra,* 302 S.W.2d at 317; *C. A. Burton Machinery Co. v. National Surety Co., supra,* 182 S.W. at 804, nor any of the other precedents cited to us purports to lay down an exclusive method by which a plaintiff materialman must show which parts of his account with the contractor are chargeable to the bond. The facts necessary to sustain a recovery or a defense in a civil action may be established by circumstantial evidence, *Schneider v. Prentzler,* 391 S.W.2d 307, 309–310[2] (Mo.1965); *Hall v. St. Louis Public Service Co.,* 248 S.W.2d 33, 36[2] (Mo.App.1952), and such evidence need not have the quality of absolute certainty; it is sufficient if it affords a substantial basis for the inferences or conclusions necessary to establish the case or defense. *McCarthy v. Wulff,* 452 S.W.2d 164, 168[5] (Mo.1970); *Van Brock v. First Nat. Bank in St. Louis,* 349 Mo. 425, 431–432, 161 S.W.2d 258, 260–261[1–3] (1942). Plaintiff's burden was to produce evidence from which the trial court could reasonably find or infer that it sold or delivered materials to Jackson and that those materials were incorporated or consumed in the Kickapoo building project, and that it had not been paid for those materials.

Directing our attention first to the proof that plaintiff sold and delivered materials which were incorporated into the Kickapoo building project, we find that plaintiff introduced and the court received plaintiff's

---

**3.** On direct examination, Mr. Dean Hartman, plaintiff's managing officer, appeared and explained plaintiff's records. At one point Mr. Hartman's testimony ran thusly: "Q. And is there any way that you can tell by looking at any of the weight tickets there where that particular load of materials went? A. There's no way. Q. And so, you can tell the Court under oath that any particular load that's represented by those weight tickets did go to the Kickapoo job? A. Maybe I should correct that. There's a few that say—as a whole, I do not know where they went, only that someone put 'Kickapoo School' on some of these [weight tickets], but I would not know. No, sir, I would not know, and I do not follow the trucks. I have no way of knowing that these in fact [went] there...."

exhibit 12, the subcontract let to Jackson by DeWitt-Newton. This document advises Jackson (doing business as D. O. Allen Asphalt Paving) that his bid for "Asphalt Paving And Installing The Materials for a 'Red Dog' track Surface Including Base Stone, Sand and Red Dog Topping" has been accepted. Jackson is "authorized to proceed at once, in accordance with the plans and specifications for [Kickapoo] High School . . . ." The base bid is $47,300.00 for the asphalt paving and $1,900.00 for the "Red Dog" installation. Supplementary Conditions are attached and incorporated. Two of them are of interest. Jackson is bound by condition (a) to submit monthly estimates for partial (progress) payments for labor and materials delivered to the job site during the preceding month, and if required by the prime contractor receipts or other vouchers showing payment for the labor and materials to the date of the estimate. If the vouchers are not submitted, then the prime contractor is authorized to pay the materialman directly. By supplementary condition (c), Jackson is obligated to pay promptly for any materials or supplies used or consumed in completing the subcontract and to indemnify the prime contractor for "any claim, lien, judgment, court costs and expenses incurred on account of [Jackson's] failure to comply with the terms of this contract."

The plans were not introduced, or at least they are not before us. The specifications were, as plaintiff's exhibits 4 and 6. Exhibit 4 specifies the materials to be used in doing the asphalt paving. Among other things, this specification requires the use of rolled base stone, MC–O grade cutback asphalt for a prime coat, and Type "C" Hot-Mix Asphaltic Concrete for the wearing surface. Thus the type of materials required is definitely shown; the amount is not.

To establish the probable cost, and thus indirectly the probable amount of materials required, plaintiff had the evidence of one Jess Potter and that of its managing officer, Mr. Hartman. Mr. Potter was an estimator for a local paving company. His employer had bid on the asphalt paving

work. In preparing an estimate for such a paving job, Potter took in consideration the labor, material and machinery required, as well as the distance to the job. Some profit was calculated into the job. As a "rough estimate," Potter gave as his opinion that the cost of materials represented one-half the bid. Mr. Hartman had also bid on the job. He had "calculated the yardage and how much [material] was required." By Mr. Potter's estimate, the cost of materials required would be about $23,650.00; Mr. Hartman's estimate was $25,897.23, based on his calculation of the amount of materials required, his records of sales to Jackson during the time the asphalt paving was being done and actual measurement of the paved surfaces after the project was completed.

The asphalt paving work at Kickapoo was substantially completed during October 1971; to show that it had sold materials of the order required by the specifications, plaintiff produced three types of business records, as previously noted. The invoices sent to Jackson in October 1971 show that between October 5 and October 29, Jackson purchased base rock, MC–O primer and "mix" of the value of $29,480.00. The "weight tickets" for October 1971—taken by the plaintiff from its files—show that Jackson purchased C–Mix, base stone and primer from the plaintiff of the value $25,-897.23.

As an aside, it should be noted that during the trial, plaintiff was permitted to amend its petition to claim an additional $587.84 for materials delivered in July 1972. This additional claim was made because plaintiff learned during discovery that part of Jackson's work, specifically the tennis courts, required repair. The obligee and the prime contractor consented to this extension. Under the terms of the bond, the surety waived notice of any extension of time. Proof of delivery of materials for the repair work was made in much the same manner as delivery of the materials for the original construction.

Plaintiff also had the stipulation of all parties that: (a) Jackson furnished labor, but no materials, in constructing the "Red Dog" track; (b) Jackson was the sole subcontractor for the asphalt paving work at Kickapoo, and (c) all the materials furnished by Jackson in completing the asphalt paving work came from the plaintiff.

Mr. Jackson testified. Certainly he was at odds with plaintiff concerning the amount of his account, but he did testify that he completed the asphalt paving as the specifications required and that the unit prices charged by the plaintiff were fair and reasonable. He conceded that materials worth more than $20,000.00 were incorporated in the Kickapoo building project.

■ Basing its conclusion upon the evidence we have recited, the trial court found that the plaintiff furnished Jackson with materials of the reasonable value of $26,-485.07, including the materials furnished in July 1972, and by implication that the materials were incorporated in the Kickapoo building project. So, and to reiterate, the question is whether the evidence warrants the conclusion that the stone, primer and asphaltic hot mix sold and delivered to Jackson by the plaintiff were incorporated into the Kickapoo building project and were covered by the bond. We conclude it does, even though the invoices and the weight tickets do not specify the project for which the particular items were intended. There was substantial evidence of the amount and kind of materials required by the Jackson subcontract; there was substantial evidence that plaintiff sold such materials to Jackson during the time the paving work was being done; it was stipulated that Jackson was the only subcontractor who did any asphalt paving and that whatever materials went into the Kickapoo asphalt paving project were furnished by the plaintiff. It is conceded that Jackson was paid for the work called for by the specifications. Jackson himself testified that he used materials of the value of at least $20,000.00 in construction of the asphalt paving. This testimony authorized a finding that the materials sued for were used in the construction of the

work. *City of Springfield ex rel. Horton v. Koch, supra*, 228 Mo.App. at 517, 72 S.W.2d at 194[5]; *State v. Lyle*, 222 Mo.App. 676, 680, 5 S.W.2d 453, 455[2] (1928). The value of the materials used was a matter of fact for the trial court; inasmuch as the court's finding was within the range of values testified to, we cannot say there was no substantial evidence to support the finding. Cf. *Baker v. Brown's Estate*, 365 Mo. 1159, 1165–1166, 294 S.W.2d 22, 27–28[14][15] (1956) (value of services rendered); *Miller v. Johnston*, 324 S.W.2d 140, 143–144[3, 4][5, 6] (Mo.App.1959) (value of crops lost). Nothing in the record before us creates a firm belief that the finding was wrong.

The other inquiry upon this point is whether plaintiff proved the materials had not been paid for. Setting the matter of application of payments received to one side, the question is whether plaintiff proved Jackson was indebted to it in an amount in excess of the amount claimed. The amount due on Jackson's account was in spirited conflict. Plaintiff produced records which purported to show the amount due at all times between June 7, 1971, and December 31, 1978. Mr. Hartman testified that the balance Jackson owed on December 31, 1978, was $112,516.77, as demonstrated by plaintiff's exhibit 37. This balance includes a disputed service charge, several rectifications and various sums written off, apparently for tax purposes. In the view we take of this appeal, another recomputation of the entire account is unnecessary. It is sufficient to say that the trial court could have found that on November 2, 1971, shortly after the materials for the original construction were delivered, and on July 24, 1972, shortly after the delivery of the repair materials was made, Jackson owed plaintiff an amount in excess of the amount claimed as the reasonable value of materials, even deducting a service charge of $492.69 posted on plaintiff's exhibit 22 on December 3, 1971. It may therefore be said that the evidence warrants a finding that in October 1971, plaintiff sold and delivered to Jackson materials of the value of $25,897.23; that in July 1972, plaintiff sold and delivered materials of the value of $587.84 to Jackson;

that those materials were incorporated in the Kickapoo building project, and that the total amount of Jackson's account on both occasions was in excess of the amount claimed. Plaintiff satisfied its primary burden of proof.

Returning to appeal number 11566, plaintiff's appeal, we proceed to plaintiff's assertion that the trial court erred in denying its claim for a "service charge" in the amount $27,192.08, due, plaintiff argues, on that part of Jackson's account allocable to the Kickapoo project for the period from December 1, 1971, to December 31, 1978. The trial court found that the bond contained no specific reference to "service charges"; that when Jackson first started doing business with plaintiff there was no discussion concerning a service charge on Jackson's account; that no written agreement concerning the assessment of service or finance charges on Jackson's past due account was ever executed; that prior to and during the completion of the Kickapoo building project, there was no agreement nor any discussion between the plaintiff and Jackson concerning the assessment of a service charge against Jackson's account for materials purchased for use in the Kickapoo project, and that Mr. Hartman testified that no service charges were assessed against Jackson's account during the period from June 7, 1971, through November 30, 1971.

The court further took the documentary proof into account. It found that the October 1972 statement contained the first notice to Jackson that plaintiff intended to assess a finance or service charge on his account; prior to September 1972, the record of Jackson's account showed no indication of any intention to assess any finance charge. This particular finding refers to defendant's exhibit N, but that exhibit is merely a copy of plaintiff's exhibit 22, which supports the court's finding.

The trial court further found that plaintiff's managing officer did not know whether the originals of the invoices marked as exhibit 19 contained a stamped notice indicating assessment of a service charge. It observed that the originals of invoices marked D through F, introduced by defendant Transamerica, contained no indication that a service charge was being assessed on Jackson's account. The only explanation offered by plaintiff's managing officer was that these invoices went out unmarked contrary to his instruction. The originals of the plaintiff's invoices marked as defendants' exhibit HH (not filed here), covering the period from June 7, 1971, through July 6, 1972, bore no legend indicating assessment of a service charge. Further findings were that in another action filed on a statutory bond against another corporate surety in the same court, plaintiff had made no claim for a service charge, and that at the time plaintiff made its original demand against defendant Transamerica, plaintiff made no demand for any service charge.

In this court, plaintiff argues that the service charge became a part of its contract with Jackson as a matter of law by the operation of § 400.2–207 and § 400.2–208. Section 400.2–207 provides, in material part, that:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) . . . Between merchants such [additional] terms become part of the contract unless:

. . . .

(b) they materially alter it; or

(c) notification of objection to them . . . is given within a reasonable time after notice of them is received."

Plaintiff asserts the evidence was clear that it imposed a service charge on its customers' accounts as part of its credit policy; the only matter in dispute is when and how that fact was communicated to Jackson. Once the term was communicated to Jackson, it is argued, it became a part of his agreement with Midland Paving.

It has been held, perhaps too broadly, that U.C.C. 2–207 was meant to alter the "mirror-image" rule of offer and acceptance which is part of the traditional law of contracts. *Steiner v. Mobil Oil Corp.*, 20 Cal.3d 90, 141 Cal.Rptr. 157, 569 P.2d 751, 757 (bank 1977); J. Calamari and J. Perillo, Contracts § 32, p. 50 (1970). It is probably more accurate to say that U.C.C. 2–207 alters the traditional rules of offer and acceptance only when it appears that the sale is governed by a modern equivalent of the "law merchant"—a course of dealing which amounts to an "industry-wide" practice. The distinction drawn between "merchants" and "non-merchants" by § 400.2–207(2) so limits and qualifies § 400.2–207(1) that unless the existence of a general mercantile practice is shown, the additional terms of the acceptance become part of the contract only when they are in turn accepted by the offeror. J. Calamari and J. Perillo, Contracts § 32, p. 51. Plaintiff now asserts that because it was a merchant dealing with a merchant, the imposition of a 1.5 percent per month service charge did not materially alter the contracts of sale and the service charge became a part of those contracts because Jackson continued to make purchases after the service charge was imposed.

We find ourselves unable to agree even if we assume Jackson and plaintiff were both "merchants" within the meaning of § 400.-2–207. Bearing in mind that we are concerned with plaintiff's agreement at the time the supplementary conditions of Jackson's subcontract were breached, we are unable to find, as a matter of law, that the "additional term" for which plaintiff contends was efficiently communicated to Jackson. We are well aware that the commentary upon § 400.2–207 states a clause providing for interest on overdue invoices or fixing the seller's standard credit terms are not "material" changes within the intent of § 400.2–207(2)(b) if they are within the range of trade practice and do not limit any credit bargained for, but the "service charge" plaintiff sought to impose would double the amount due on Jackson's account.[4] The authorities we have found require clear and unequivocal notice to the purchaser if the service charge is more than the normal statutory rate of interest. *Graham Paper Co. v. Schottco Corp.*, 555 F.2d 193, 197[3] (8th Cir. 1977); *Loizeaux Bldrs. Supply Co. v. Donald B. Ludwig Co.*, 144 N.J.Super. 556, 366 A.2d 721, 725[9] (1976). The trial court found the plaintiff never advised Jackson of the imposition of a service charge during the time with which we are concerned; the record supports that finding. In the circumstances, plaintiff's imposition of a 1.5 percent per month service charge as part of the amount chargeable to the bond constitutes an unwarranted unilateral action.

A further and equally unavailing argument is that the service charge became a part of plaintiff's contract with Jackson by operation of § 400.2–208, which addresses the impact of the parties' "course of performance" upon a contract of sale. It has been said that U.C.C. 2–208(1) means that the parties' "course of performance" may be shown to modify the contract of sale, J. Calamari and J. Perillo, Contracts § 52, p. 102, but plaintiff's argument that the parties' course of performance requires a finding that the service charge became a part of Jackson's contract as a matter of law is specious. Conceding the operation of the statute is a matter of law, the existence of a course of dealing to initiate its operation is a question of fact. So far as we can determine, the entire agreement between the plaintiff and Jackson rested in parol; the invoices for October 1971 do not even bear the legend "terms: net 30 days," or "due upon delivery." The terms of the parties' agreement were matters of fact for the trial court. *Brannock v. Elmore*, 114 Mo. 55, 63–64, 21 S.W. 451, 453–454 (1893); *Stagner v. Staples*, 427 S.W.2d 763, 766[1] (Mo.App.1968). The trial court found no "course of performance" to indicate Jackson's assent to a service charge. Our examination of the record creates no firm belief that its conclusion was wrong.

4. We have assumed the "service charge" to be exempt from the operation of Regulation Z.

■ Another point advanced by plaintiff on its appeal is that the trial court improperly admitted testimony of defendant Jackson concerning payments made to the plaintiff because defendant Transamerica failed to disclose that information to the plaintiff in response to plaintiff's pretrial interrogatories. We have considered this point but we decline to discuss it at length. The imposition of sanctions for failure to disclose information sought by written interrogatories is a matter within the discretion of the trial court. *Bethell v. Porter*, 595 S.W.2d 369, 377[10] (Mo.App.1980); *Aulgur v. Zylich*, 390 S.W.2d 553, 557[4] (Mo.App.1965). The information of which plaintiff contends it was deprived was available from its own records; further, plaintiff's counsel could have inquired into the subject of payment when Jackson's deposition was taken. We find no abuse of discretion in permitting Jackson to testify about the payments he made to the plaintiff.

One of the principal questions at issue on all three appeals is whether the trial court erred in holding that the $20,000.00 payment made by Jackson on November 18, 1971, should have been credited to that part of his account which was chargeable to the bond. Plaintiff contends that the trial court erred in so ruling because: (a) Jackson directed the plaintiff to apply the payment to his open account, and (b) even if Jackson's direction was legally ineffective, there was no substantial evidence that the plaintiff knew or should have known the source of the $20,000.00 payment. Defendants Transamerica and DeWitt-Newton argue that the principles governing the application of payments to different debts stated in *Herrman v. Daffin, supra*, 302 S.W.2d at 315–316[1,2][3][4] and in §§ 387, 388 and 389 of the Restatement of the Law of Contracts (1932), mandate and require the result reached.

■ To state the applicable law a bit more fully, the authorities generally recognize that the relation of surety and principal is usually created by express contract but may nevertheless arise by operation of law. Stearns, Suretyship § 23, pp. 24–25 (2d ed. 1915); 74 Am.Jur.2d, Suretyship § 8, p. 17 (1974). The similarity of purpose between § 107.170 and the "Miller Act," 40 U.S.C.A. § 270a, has been noted by this court. Both statutes demonstrate a strong legislative purpose to protect those who furnish labor and materials for public construction and to assure that they will be paid. *First State Bank v. Reorganized Sch. Dist. R–3, Bunker, Missouri*, 495 S.W.2d 471, 475–476 (Mo.App.1973). The statutes are analogous and federal cases involving similar principles are persuasive.

■ That § 107.170 operated ex proprio vigore to extend Transamerica's suretyship to the plaintiff as principal is clear from such cases as *United States Fidelity & Guaranty Co. v. Sweeney*, 80 F.2d 235, 238–239[3][4] (8th Cir. 1935); *Camdenton Consol. Sch. Dist. No. 6 of Camden County ex rel. W. H. Powell Lumber Co. v. New York Cas. Co.*, 340 Mo. 1070, 1085–1086, 104 S.W.2d 319, 327[4] (1937); and *City of St. Louis v. Kaplan-McGowan Co.*, 233 Mo.App. 789, 796, 108 S.W.2d 987, 991[6] (1937). In response to the surety's contention that its bond was only a performance bond because it did not expressly include payment for labor and materials, our Supreme Court held, in *Camdenton Consol. Sch. Dist. No. 6 of Camden County, supra*, 340 Mo. at 1085, 104 S.W.2d at 327[4]:

> "The corporate surety with knowledge of the condition and obligation relating to labor and material imposed by the statute and provided for by the contract executed the contractor's bond ... and though the bond, in the form used and as executed, did not contain the statutory obligation relating to labor and material ... it must be treated and considered as a statutory bond and the statutory obligation read into it. We hold, therefore, that appellant, *under and by virtue of the statute, is liable as surety on the bond to materialmen and laborers* on their properly established claims." (Our emphasis.)

The rules of law applied by the trial court were undoubtedly those commonly stated to determine the proper application of a pay-

ment made by a debtor to a creditor to whom the debtor owes two or more mature and similar obligations. The law governing application of the $20,000.00 payment was very precisely stated as an exception to the general rules in *St. Paul Fire and Marine Insurance Co. v. United States ex rel. Dakota Electric Supply Co.*, 309 F.2d 22, 24–25 (8th Cir. 1962), as follows:

> "... (iv) If the debtor is under a duty to a third person to devote funds paid by him to the discharge of a particular debt, the payment must be so applied if the creditor knows or has reason to know of that duty. This is so despite the debtor's contrary direction.
>
> ... The noted exception, phrased in terms of duty, rests on equitable considerations. Examples which the cases recognize without much conflict are where the surety itself makes a payment to the debtor *or where money which comes to the creditor from the debtor is the same money for the payment of which the surety is bound and the creditor knows the source of that fund.*" (Our emphasis.)

This rule, or exception to the general rule, has been stated many times in cases involving public works contracts, e.g., *United States ex rel. C. H. Benton, Inc. v. Roleof Const. Co.*, 418 F.2d 1328, 1330 (9th Cir. 1969); *Graybar Electric Co., Inc. v. John A. Volpe Construction Co.*, 387 F.2d 55, 58–59[6] (5th Cir. 1967); *United States ex rel. Hyland Electrical Supply Co. v. Franchi*

*Bros. Construction Corp.*, 378 F.2d 134, 137–138 (2d Cir. 1967).[5] We are in no doubt the principle applies here if there is substantial evidence that Hartman knew or should have known the source of the $20,000.00 payment.

■ A trial court, functioning as a fact-finder, can draw all reasonable inferences from the evidence presented to it and can base its ultimate findings upon such reasonable inferences. *State ex rel. Eagleton v. Patrick*, 370 S.W.2d 254, 257[5], 97 A.L.R.2d 1180, 1184 (Mo.1963). The trial court found that Hartman, plaintiff's managing officer, had been in the construction business since 1956 and was as familiar as a layman can be with the rights and obligations of a contractor or subcontractor who undertakes to construct a publicly-owned building or other structure.[6] Hartman knew it was common practice for the owner to make progress payments to the prime contractor and the subcontractors as the work progresses, and he was familiar with the practice of withholding a part of the contract price as retainage, to be paid when the work is finally completed and the architect has issued a certificate authorizing final payment. There was also evidence indicating Mr. Hartman knew, in a general way, that a creditor has some obligation to protect the interest of a surety, if the creditor knows or has reason to know that money paid to him is received from a particular bonded job. There was also evidence that Hartman and Jackson communicated frequently.

---

5. Those interested in the subject, if any, may consult Restatement (Second) of the Law of Contracts §§ 258, 259 and 260 (1981); Note, Allocation of Payment by Creditor Holding Two Obligations of Which One Only is Guaranteed by a Third Party, 32 Va.L.Rev. 167 (1945); Note, Equities of Third Parties Affecting Application of Payments, 83 U.Pa.L.Rev. 898 (1935), in addition to the general authority meticulously collected in *St. Paul Fire and Marine Insurance Co. v. United States ex rel. Dakota Electric Supply Company, supra*, 309 F.2d at 25.

6. To illustrate, Mr. Hartman testified on cross-examination by Transamerica: "Q. You are familiar with the facts [sic] that the general [contractor] has the right to file a mechanic's lien within 6 months after he does his last work; you know that, don't you? A. What time—

what are you referring to? Are we talking about schools, the Kickapoo—Q. I'm talking about construction work. A. No, sir. That is not the case, as I understand it. That is not the general rule, as I understand it; no sir. Q. And what do you think the rule is? A. I have been under the impression you cannot file a mechanic's lien on public buildings, sir." Upon his third redirect examination by plaintiff's counsel, Mr. Hartman testified: "Q. With regard to the Kickapoo job, when did you know it was secured? A. I have always known it was secured. Q. And why? A. Because we've done enough school work for the City, County, State, and Federal jobs in that school system jobs are all required by law to be bonded. There was never a question in our mind."

Jackson completed his work at Kickapoo—except for the tennis courts—in October 1971. He then submitted an invoice for a progress payment to DeWitt-Newton in the amount of $44,935.00. After Jackson requested the payment, but before he received it, he had a conversation with Hartman, indicating that he expected to be paid.

Jerome Stiefvater, DeWitt-Newton's managing officer, testified that he had a conversation with Hartman "about the time [the Jackson] estimate was to be [sent] forward for approval." Hartman asked "whether Mr. Jackson had a pay request in for the paving on the Kickapoo High School"; Stiefvater said "yes," and added that he had every reason to suppose Jackson's progress payment would be forthcoming. "About three weeks later," Jackson "picked up" the check at DeWitt-Newton's office. The check, before us as defendants' exhibit BB, is drawn in the sum of $40,441.50 and is made payable to "D. O. Allen Asphalt Paving." Jackson deposited this check in his account at a local bank.

On November 18, 1971, Jackson drew a check in the amount of $20,000.00, payable to the plaintiff. Jackson delivered the check to plaintiff's office. The payment was credited to Jackson's open account; no part of the payment was credited to that part of Jackson's account allocable to the Kickapoo project.

■ We reject plaintiff's contention that there is absolutely no evidence tending to prove it knew the source of the $20,000.00 payment. Perhaps another conclusion might reasonably have been drawn, but there was evidence aplenty that plaintiff knew the $20,000.00 payment was part of a progress payment Jackson had received from DeWitt-Newton. The controlling precedents require that the entire payment be allocated to that part of Jackson's account chargeable to the bond, whatever his instruction to the plaintiff was.

Plaintiff argues that part of this payment was derived from other projects and the part which came from other projects should not have been applied to Jackson's Kickapoo account. By plaintiff's calcula-

tion, $2,456.45 is traceable to sources other than Jackson's payment from DeWitt-Newton. In substance, the argument is much the same as the "free funds theory" discussed and rejected in *United States ex rel. Hyland Electrical Supply Co. v. Franchi Bros. Construction Corp., supra,* 378 F.2d at 138–139[3]. To agree with plaintiff's argument, it would be necessary to assume that plaintiff had some order of claim against Jackson's bank account superior to that of other general creditors, that is, some right which would give him a lien on specific funds other than those attributable to the Kickapoo account. No reason appears to give plaintiff such preference, and we decline to pursue the matter sua sponte.

The other principal point for resolution is tendered by points I and III of defendant DeWitt-Newton's brief in appeal number 11572. Defendant DeWitt-Newton contends that the trial court erred in entering judgment for plaintiff in the amount of $5,879.23 because awarding that amount erroneously imposed a duty on the prime contractor to insure that Jackson's part of the retent was paid to the plaintiff, when in fact the controlling precedents required the plaintiff to inquire into the source of Jackson's final and retainage payment. It is further maintained that even if knowledge of the source of Jackson's retainage payment cannot be imputed to the plaintiff, the equities of the cause require application of that payment so as to protect the surety and the prime contractor. In appeal number 11571, defendant Transamerica joins in these two points. Plaintiff has elaborately defended the trial court's action, pointing out, as perhaps we should, that the amount awarded to the plaintiff represents the principal amount of its claim less the $20,000.00 payment made by Jackson on November 18, 1971.

There was evidence from which the trial court could find that during the late summer of 1972, DeWitt-Newton received a second inquiry from the plaintiff concerning sums owed to Jackson for his work at Kickapoo; specifically, Hartman asked about final payment or payment of the

retainage. Hartman was told that DeWitt-Newton had not received the retent from the school district, but every effort was being made by the prime contractor to conclude the Kickapoo transaction and to obtain final payment. Hartman testified that he made many inquiries at various times, but knew nothing about final payment for the Kickapoo project until 1973. This was true, according to Hartman, even though he had numerous conversations with Mr. Stiefvater, Mr. DeWitt and others complaining that he had not been paid. Hartman also testified that when he asked Jackson about final payment ". . . Jackson kept telling me he had work he had to correct, and he had not got paid yet." Hartman unequivocally denied that he had any knowledge the Kickapoo project was complete in 1972 or the early part of 1973 and stated he was not aware that a final and retainage payment had been made to Jackson and others until he consulted Mr. Herndon, an architect employed by the school district, in 1973.

There was evidence that in September 1972, Mr. Stiefvater contacted Jackson by telephone and advised him that a retent payment was available, but a "lien waiver" would be required by the general contractor before payment could be made. Jackson responded that he could not sign a lien waiver until he discussed the matter with the plaintiff because he would, in effect, be executing the document before he paid plaintiff all he owed for materials used in the Kickapoo paving project. Nonetheless, Jackson appeared at DeWitt-Newton's office on September 8, 1972, to receive his retent payment. Stiefvater asked if Jackson had matters arranged with the plaintiff, and Jackson said "yes." It was Stiefvater's recollection that Jackson said he was going to make a payment to the plaintiff with the retainage check. Jackson signed a document to which Stiefvater referred as a "standard lien waiver" and received a check—in evidence as defendants' exhibit L—in the amount of $7,048.50. The document executed at this time is simply a document which waives all claim to any lien on the building described. It contains no representation whatever that materialmen,

if any, have been paid. The trial court found that DeWitt-Newton did not contact the plaintiff at the time this payment was made and the defendants do not contend otherwise.

Jackson deposited the retent payment in his bank account. On September 11, he drew and personally delivered his check in the amount of $10,000.00 to the plaintiff. This check, plaintiff's exhibit 69, is marked: "FOR *On Account*," and Jackson testified at one point that he intended for this payment to be applied to his open account. Mr. Hartman, on cross-examination, said he could not recall the occasion but it was standard procedure to apply any payment received to the oldest unsecured account.

On September 21, 1972, the supervising architect advised DeWitt-Newton that before final payment could be made, "you will need to submit an Affidavit stating that all payrolls, bills for materials and equipment, and other indebtedness connected with the Kickapoo High School project have been paid, and your subcontractors will need to do likewise." This letter, marked as defendants' exhibit Y, further states that specimen forms are enclosed, and concludes with a request that DeWitt-Newton "return two copies to our office as soon as possible so there will be no hold up on your final payment." Appropriate affidavits were enclosed. One of these affidavits was sent to Jackson; it was received as plaintiff's exhibit 10 and recites that:

"... [A]ll claims and demands, whether due from sub-contractors, materialmen or otherwise, which might be the basis of a claim against the surety on either the Subcontractor's bond or on the Contractor's bond, have been paid in full and . . . there are outstanding no claims for labor, material, or for any other thing which would constitute a claim against the surety on either the Subcontractor's bond or on the Contractor's bond."

Mr. Halter, DeWitt-Newton's office manager, testified that when he received the architect's letter, he examined DeWitt-Newton's records and determined "all the

people we had to have affidavits from." The names of the various subcontractors and others from whom affidavits were needed were inscribed on the back of the letter by the prime contractor's employees. Jackson's firm was the first listed. Jackson signed the affidavit on November 27, 21 days after he received his retent payment. On April 20, 1973, Mr. Stiefvater executed an affidavit on behalf of DeWitt-Newton, the prime contractor, stating that:

"... [H]e [had] made the investigation required by Article 9 of the General Conditions and that all claims and demands, whether due from subcontractors, materialmen or otherwise, which might be the basis of a claim against the surety on the Contractor's bond, have been paid in full and ... there are outstanding no claims for labor, material, or for any other thing which would constitute a claim against the surety on the Contractor's bond."

The affidavits executed after Jackson received his retent payment are significant in light of § 15.15 of the Supplementary General Conditions of the general contract, offered and received in evidence as plaintiff's exhibit 8. Section 15.15.1 reads as follows:

"9.7.3 Neither the final payment nor the remaining retained percentage shall become due until the Contractor submits to the Architect (1) an Affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or his property might in any way be responsible, have been paid or otherwise satisfied, (2) consent of surety, if any, to final payment...."

Defendant DeWitt-Newton contends that plaintiff's failure to inquire directly about final payment immediately after the retent was distributed indicates it knew the source of the $10,000.00 payment of September 11, 1972. It is further argued that plaintiff was in possession of sufficient information to compel it to inquire about the source of the payment, and if plaintiff had inquired, its knowledge of the "principal source" of the $10,000.00 payment would have required plaintiff to apply that payment to Jackson's Kickapoo account. We acknowledge that both *St. Paul Fire and Marine Insurance Co. v. United States ex rel. Dakota Electric Supply Company, supra,* 309 F.2d at 25, and *Herrman v. Daffin, supra,* hold that if a materialman knows or is chargeable with knowledge of the source of a payment, then it is the materialman's duty to apply the funds received so as to give credit to and protect the rights of the person supplying the funds. Nevertheless, we conclude the trial court could have found that plaintiff was unaware of the source of the $10,000.00 payment. Further, we believe this particular case is not governed by the principle relied on by DeWitt-Newton. Neither do we believe that the law stated in *United States ex rel. Clark-Fontana Paint Co., Inc. v. Wibco, Inc.,* 396 F.Supp. 1253, 1256[2] (D.D.C.1975), aff'd 539 F.2d 243 (1st Cir. 1976), is persuasive on the facts. That case indicates the equities favor the allocation of payments to fulfill their implicit purpose, and that "reason to know" the source of payment is not required when the debtor himself has made no allocation of the payment. In our case there is evidence that Jackson allocated the payment to his open account.

■ The trial court indicated it believed the general contractor was under a duty to inquire of the plaintiff and other materialmen before it paid out the retainage. Authority can be found for the proposition that a public works contractor has a legal duty to see that its obligations are discharged before making distribution of the retent. See, e.g., *Utah State Building Commission ex rel. Mountain States Supply Co. v. Great American Indemnity Company,* 105 Utah 11, 140 P.2d 763, 772[15] (1943). Here we need not rely on such rulings as a matter of abstract duty, for the general contract itself requires the prime contractor to inquire before making the final or retent payment. There is every reason to suppose the plaintiff had complained on numerous occasions about Jackson's delinquency before the prime contractor's final affidavit was executed on April 20, 1973. No inquiry was made when Jackson received his retain-

age payment except to ask if he "had things worked out"; that was not the inquiry required by the terms of the general contract. Upon consideration of the whole record, we agree that DeWitt-Newton should have asked plaintiff about Jackson's bill *before* it paid the final $7,048.50 due on the Kickapoo paving work. We do not say nor intimate that payment was made in bad faith; it was made prematurely and without proper precaution.

■ Such discussion disposes of the points presented and argued. We are not authorized to consider points other than those stated in the "Points Relied On." *Pruellage v. De Seaton Corporation*, 380 S.W.2d 403, 405 (Mo.1964); *Smith v. Welch*, 611 S.W.2d 398, 399[1] (Mo.App.1981); *Brewer v. Blanton*, 555 S.W.2d 381, 383[1] (Mo.App.1977). Our review of the record and the applicable law discloses no erroneous declaration nor application of the law and creates no firm belief that the judgment is wrong. Accordingly, the judgment of the trial court is affirmed.

BILLINGS, J., concurs.

PREWITT, P. J., and MAUS, J., disqualified.

### ON ALTERNATIVE MOTIONS FOR REHEARING OR TO TRANSFER

PER CURIAM:

■ All three appellants have filed timely motions for rehearing or for transfer to the Supreme Court pursuant to Rules 84.17 and 83.02, V.A.M.R. The motions merely reargue matters considered in the opinion filed. Such reargument of issues must be disregarded. *Ackerman v. Globe-Democrat Publishing Company*, 368 S.W.2d 469, 481[13] (Mo.1963), cert. denied 375 U.S. 949, 84 S.Ct. 353, 11 L.Ed.2d 276 (1963); *Thompson v. Gray*, 415 S.W.2d 299, 307[11] (Mo.App.1967). Accordingly the motions for rehearing are denied; the motions to transfer are denied.

All of the Judges concur, except MAUS, C. J., and PREWITT, J., disqualified.